LAURENCE J. GORDON, INCORPORAT-
ED; Advanced Money Processing Sys-
tems, Incorporated; and Laurence J.
Gordon, Plaintiffs,

v.

BRANDT, INC., a foreign corporation,
and Brandt Systems, Inc., a foreign
corporation, Defendants.

No. C81–627C.

United States District Court,
W.D. Washington.

Jan. 14, 1983.

1146

Jerry B. Edmonds, Robert L. Williams, Williams, Lanza, Kastner & Gibbs, Seattle, Wash., for plaintiffs.

Jon W. MacLeod, Douglas C. Ross, Roberts & Shefelman, Seattle, Wash., for defendants.

## MEMORANDUM OPINION

COUGHENOUR, District Judge.

On May 5, 1981, Laurence J. Gordon was terminated as a district manager for Brandt money processing equipment. On May 22nd, he filed suit alleging federal and state antitrust and state franchise investment protection act violations. Brandt answered and asserted a counterclaim for breach of contract. After three weeks of trial and a week of deliberations, the jury was unable to reach a unanimous verdict and a mistrial was declared. The parties stipulated that the case would be treated as a bench trial on the record developed before the jury.

Plaintiffs are Laurence J. Gordon and his two wholly-owned Washington corporations: Laurence J. Gordon, Inc. and Advanced Money Processing Systems, Inc. The defendants are Brandt, Inc., a Wisconsin corporation with its principal place of business in Watertown, Wisconsin, and Brandt Systems, Inc., a wholly-owned corporation now merged into Brandt, Inc. The parties shall hereinafter be referred to as "Gordon" and "Brandt."

FACTS:

The dispute between the parties concerns the sale and service of Brandt money processing equipment. Brandt manufactures and sells money processing equipment capable of counting, sorting and wrapping coins and currency. Brandt also sells paper products (such as coin wrappers and bill straps), accessories and repair parts for its equipment. Brandt products are sold throughout the United States through a network of "district managers."

A district manager is not a Brandt employee. He is an independent salesman who solicits orders for Brandt on a commission basis. He has his own sales force and is responsible for his own operating expenses. Brandt restricts each district manager from selling outside an assigned territory, dealing in products of Brandt's competitors and charging other than Brandt's specified prices.

Some district managers are permitted by Brandt to operate an "authorized" service and repair business. Under the standard service agreement, the district manager is free to set his own prices for service and is not limited to any geographic territory, although Brandt will not pay for warranty work done outside the territory. The only restrictions imposed by Brandt on the service businesses are that all service personnel must be factory trained by Brandt, and that the district managers cannot service equipment manufactured and sold by Brandt's competitors. In some parts of the country, Brandt directly services equipment through its own field service offices.

The parties' relationship began in 1975 when Gordon became a salesman for the Brandt district manager in Oregon. On March 6, 1976, Gordon replaced the Oregon district manager. A series of contracts regarding the sale and service of Brandt equipment have been entered into between the parties, the last being signed in January of 1978. Under that agreement, plaintiff became the district manager for most of Oregon and Washington. The relevant portion of this standard district manager's contract provided that Gordon would: (1) devote his entire time to the sale of Brandt money processing equipment, except for operating an authorized Brandt service business; (2) sell the equipment at the prices set by Brandt; (3) not deal in used equip-

ment and return all trade-ins received to Brandt; (4) solicit orders only on Brandt order forms or forms approved by Brandt; (5) be unable to bind Brandt for any order he solicited; (6) return Brandt's demonstrator inventory upon termination as a district manager; (7) not compete in the manufacture and sale of money processing equipment for three years after termination; and (8) be terminated as a district manager upon commission of any act of dishonesty or gross misconduct in connection with his relationship with Brandt.

Plaintiff operated a successful sales and service business until his termination on May 5, 1981. The stated reasons for the termination were that Gordon bought equipment under fictitious customer names, purchased equipment and paper products for resale, solicited orders for equipment outside his territory, engaged in price negotiations with customers, dealt with a Brandt competitor and diverted monies belonging to Brandt.

The evidence established that plaintiff did breach his contract with Brandt. Gordon "formed" Portland and Oregon Publications for the sole purpose of buying Brandt equipment for resale. He used the fictitious names of Dave Standard and M. Taylor as signators on the order forms and forged purported signatures as purchasers. Plaintiff received volume discounts from Brandt for these sales, to which he would not otherwise have been entitled. He then resold some of this equipment at a profit. Through AAccurate Coin Systems, Inc., a company created by plaintiff's brother Mike Gordon, Brandt paper products were purchased for resale. Gordon admits that he has, on occasion, varied the prices set by Brandt on its equipment. He also admitted to "signing" customers' names to Brandt order forms. On at least one occasion, plaintiff sold outside his territory. Finally, there is evidence that Gordon had legitimate Brandt customers increase their orders to Brandt so that plaintiff could receive equipment for resale.

While conceding that he may have violated the terms of his contract, Gordon claims that his actions were with the knowledge and consent of Brandt and that Brandt's stated policy, as manifested by the contract, was different from Brandt's actual policy. He contends that Brandt knew he was purchasing equipment and paper products for resale, negotiating price, signing customers' names to the Brandt order forms, and ordering equipment through Portland and Oregon Publications. The weight of the evidence is to the contrary.

Employees and officers of Brandt testified that they did not authorize plaintiff to operate in violation of the contract and that they did not know that plaintiff was so operating. The Court notes that although Gordon claims defendant permitted and perhaps encouraged him to order equipment for resale, when he completed the. order form, he carefully contrived the signature of the "purchaser" to appear different from the remainder of the handwriting on the form, although both were in his handwriting. Plaintiff went so far as to use different colored pens and slanting the handwriting in different directions to highlight the "differences." Gordon paid for these orders with certified checks for the obvious purpose of masking the fact that he was the true purchaser. When asked about AAccurate Coin Systems, plaintiff refused to reveal that AAccurate was owned by his brother or that plaintiff participated in its management. Plaintiff's diligent efforts at concealment are inconsistent with his contention that defendant approved of his tactics.

The testimony and weight of the evidence supports defendant's position that it did not know that Gordon was violating the contract. Plaintiff's testimony that Brandt had a stated policy different from its actual policy is not believable. Although Gordon clearly wanted Brandt to vary the terms of the contract and may have in fact believed that Brandt permitted him to do so, such a conclusion in light of the clear language of the contract and vigilant efforts by Brandt to ensure that the district managers were abiding by the contract would be unreasonable. The record contains examples demon-

strating that whenever Brandt was alerted to a violation of the contract by a district manager, it not only disapproved of the violations but sought to remedy them. Whatever challenges plaintiff may have to defendant's practices must therefore be tested on the basis of the contract being fully enforced.

## GORDON'S CLAIMS:

Plaintiff's claims concern the federal and state antitrust laws and the Washington Franchise Investment Protection Act. First, the restrictions imposed by the contract allegedly constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act. Second, plaintiff asserts that Brandt is or is attempting to be a monopolist in the sale and service of money processing equipment in violation of Section 2 of the Sherman Act. Third, Gordon asserts that he was a Brandt franchisee and that his termination was in contravention of the Washington Franchise Investment Protection Act. After considering all the evidence, the Court finds that plaintiff has failed to prove any of these allegations.

## SHERMAN 1:

Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "(e)very contract, combination ..., or conspiracy, in restraint of trade ...." *See* RCW § 19.86.040 (identical language in the Washington statute). Plaintiff alleges that Brandt, in violation of Section 1, engaged in: (1) price fixing; (2) restrictive territorial allocations; (3) exclusive dealing; (4) tying; and (5) group boycotts. Plaintiff's third and fourth claims raise the additional issue of Section 3 of the Clayton Act, 15 U.S.C. § 14, which prohibits the leasing or sale of a good on condition that the purchaser not deal in or use the goods of a competitor where the effect of such lease or sale "may be to substantially lessen competition or tend to create a monopoly ...."

In examining plaintiff's allegations, three issues must be addressed. First, considering the relationship between Gordon and Brandt, can the restrictions imposed by Brandt violate the antitrust laws? Second,

are the alleged restraints of trade horizontal or vertical in nature? Finally, has Gordon proven that any of the restraints are unreasonable?

## THE RELATIONSHIP BETWEEN THE PARTIES:

■ A contract, combination or conspiracy necessarily requires two or more actors. "It is axiomatic that unilateral activity by a single firm cannot be reached via this section." *Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 286 (5th Cir. 1978), *rehearing denied,* 582 F.2d 41 (5th Cir.), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1980). It is uncontested that Gordon is a separate legal entity from Brandt. Defendant, however, claims that in the sale of money processing equipment, Gordon is Brandt's agent and, for purposes of Section 1, must be treated as the same legal entity as Brandt.

■ Early cases suggested that a manufacturer could insulate himself from any antitrust liability while imposing restrictions on the sale of his product by simply retaining title to the product and designating the person with whom he dealt as his agent. *See, e.g., United States v. General Electric,* 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926) (holding that the owner of an article, patented or otherwise, was not violating the antitrust laws by fixing the prices by which his agents transferred title to the article from him directly to the consumer). *See generally Hardwick v. Nu-Way Oil Co., Inc.,* 589 F.2d 806, 808 (5th Cir.1979) (discussing the "agency" theory and how it was widely viewed as a means of circumventing the antitrust laws). The focus has, however, shifted from the name the parties have selected to describe their relationship to the substance of the relationship. *See, e.g., United States v. Masonite,* 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942) (del credere agency relationships can be within the scope of Section 1). In *Simpson v. Union Oil Co. of Cal.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), the Court held that despite the gasoline producer's retention of legal title to the gas until it was sold to the ultimate consumer,

the "consignment" relationship was in reality an impermissible price-fixing scheme. 377 U.S. at 20–21, 84 S.Ct. at 1056. Recognizing that an owner of an article "may send it to a dealer who may in turn undertake to sell it only at a price determined by the owner," where the distributor has "all or most of the indicia of entrepreneurs," the restrictions imposed ran afoul of the antitrust laws. *Id.* The Sherman Act cannot be avoided "merely by clever manipulation of words" without any real differences in the substance of the relationship. *Id.* at 22, 84 S.Ct. at 1057.

The *Simpson* analysis requires a careful examination of the relationship between the manufacturer and his distributor. Where the risks of distribution are borne by the distributor and not by the manufacturer, the manufacturer will not be able to insulate himself from the antitrust laws by technically retaining title and calling his distributor his agent. *See Greene v. General Foods Corp.,* 517 F.2d 635, 652–53 (5th Cir.1975), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976); *Pogue v. International Industries, Inc.,* 524 F.2d 342, 345 (6th Cir.1975).

The Court finds that in the sale of money processing equipment, Gordon does not possess the necessary indicia of an entrepreneur. First, title to the equipment remained in Brandt until sale to the ultimate consumer. Unlike the situation in *Simpson* where, to the average purchaser of gasoline, it would appear that the gasoline belonged to and was coming from the owner of the station, in the present case, all equipment was shipped by Brandt from Wisconsin. As Brandt retained possession of the equipment until shipped to the consumer, Brandt's legal title to the equipment prior to sale was not a means of circumventing the antitrust laws. Second, the economic costs were, for the most part, borne exclusively by Brandt. Plaintiff, unlike the dealer-manufacturer situation, made no investment in inventory. All demonstrator equipment was provided to Gordon free by Brandt and was to be returned to Brandt upon Gordon's termination as a Brandt district manager. If the market for Brandt

money processing equipment declined, the loss in value of the equipment, including the loss in value of the demonstrator equipment in Gordon's possession, would be Brandt's loss. Moreover, risk of loss for the equipment was at all times borne by Brandt or the ultimate consumer. Plaintiff's only real costs were the expenses of a salesman: travel, rent, insurance, taxes, employee's commissions and other costs associated with the solicitation of sales. Although Gordon claimed to have assumed additional "entrepreneurial" responsibilities, such as insuring delivery of equipment and warranting equipment in excess of Brandt's warranty, the testimony established that such practices were neither Gordon's standard procedure nor required by Brandt.

The district court in *Calculators Hawaii, Inc. v. Brandt, Inc., et al.,* No. 77–0203 (D.Hawaii, 1980) (Decision and Order), reached a similar conclusion. The court found that:

> Brandt (district managers) are not sufficiently independent of Brandt to qualify as independent dealers. Although they receive a percentage of their Brandt sales in lieu of salary, Brandt (district managers) are essentially agents of Brandt. District managers receive neither possession of nor title to Brandt equipment. When selling Brandt equipment, district managers merely take orders for Brandt products which are then shipped directly to the customer.

As Gordon lacks the indicia of an entrepreneur in the sale of money processing equipment, Brandt may lawfully require plaintiff to charge its specified prices. *See Marty's Floor Covering Co., Inc. v. GAF Corp.,* 604 F.2d 266, 269 (4th Cir.1979). Logically, a similar finding should be maintained for plaintiff's other challenges to the restrictions Brandt has imposed on the sale of its equipment. In other words, just as Brandt can require plaintiff to adhere to its set prices, so, too, should it be able to demand, without fear of the antitrust laws, that Gordon remain in an exclusive territory and not deal with Brandt's competitors.

See Hawes Office Systems, Inc. v. Wang Laboratories, Inc., 524 F.Supp. 610, 615 (E.D.N.Y.1981) (discussing without reaching the issue). The rule, however, may be otherwise. In *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), the Supreme Court held that restrictions placed on distributors whose relationship with their manufacturer closely resembled the Brandt district manager system,[1] were within the purview of Section 1 and would be tested under a rule of reason analysis.[2] 388 U.S. at 380, 87 S.Ct. at 1866. Although the per se holding in *Schwinn* has been overruled by *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 57, 97 S.Ct. 2549, 2561, 53 L.Ed.2d 568 (1977), the Court apparently did not reconsider its second holding in *Schwinn*. Thus, finding that Gordon does not possess the indicia of an entrepreneur might not preclude further Section 1 inquiry. *See Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90 (3rd Cir.1977), *cert. denied*, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1978) (reversing the district court's granting of summary judgment which held that restrictions imposed on an agent cannot violate the antitrust laws).

The teaching of *Simpson* is that restraints imposed on individuals who do not possess the indicia of an entrepreneur are outside the scope of Section 1. This is the better rule and the Court so finds for Brandt as to plaintiff's claims involving restrictions imposed on the sale of money processing equipment.[3] However, considering that the holding in *Schwinn* may remain valid law and that the parties concede that the service business is totally separate from Brandt, further Section 1 analysis is necessary.

## HORIZONTAL OR VERTICAL RESTRAINTS:

In an attempt to establish per se violations of Section 1, plaintiff characterizes many of the restrictions imposed by Brandt as horizontal restraints. Plaintiff alleges that this is a classic "rim" and "spoke" conspiracy in which Brandt is the "hub." Brandt purportedly secured the adherence of the district managers to the restrictions by assuring each district manager that everyone else had accepted and was bound by the same restraints. Gordon has, however, mistaken the reality of the situation. No manner of artful pleading can change the fact that the restrictions have been imposed by Brandt on all the district managers without concern for their consent or cooperation and are therefore vertical in nature.

■ The key to determining the nature of the restriction is to identify the source of

1. In *Schwinn*, the Court examined territorial and customer restrictions placed on two types of distributors of bicycles. Under the first distribution system, the distributors acted as wholesalers and bought and resold the Schwinn bicycles. Under the second system, Schwinn retained title to the bicycles and the distributors solicited orders.

2. The Court held that the restrictions imposed on the first set of distributors constituted a per se violation of Sherman 1. 388 U.S. 379, 87 S.Ct. at 1865. Presumably relying on *Simpson*, in regard to the second distribution method the Court held that:

> (w)here the manufacturer retains title, dominion, and risk with respect to the product and the position and function of the dealer in question are, in fact, indistinguishable from those of an agent or salesman of the manufacturer, it is only if the impact of the confinement is "unreasonably" restrictive of competition that a violation of § 1 results from such confinement, unencumbered by

culpable price fixing. 388 U.S. at 380, 87 S.Ct. at 1866.

The *Schwinn* Court found that the territorial and customer restrictions were reasonable and cited as the critical facts: (1) that other bicycles reasonably interchangeable with the Schwinn bicycles were available in the market place; (2) that Schwinn distributors were permitted to deal in the products of Schwinn's competitors; (3) that the restraints were not "intermixed" with price fixing; and (4) that competition made the challenged program necessary. 388 U.S. 381–82, 87 S.Ct. at 1866–1867.

3. There is an obvious inconsistency between *Simpson* and *Schwinn*. The import of *Simpson* is that absent the indicia of an entrepreneur a manufacturer may validly place restrictions on the sale of his products. *Schwinn*, on the other hand, asserts that such restraints, in the absence of price fixing, would be tested under the rule of reason. Yet, it is difficult to imagine a greater "intermixing" of price fixing than the direct price restraints imposed in *Simpson*.

the restraint. Horizontal restraints are agreements among independent business entities at the same level of the market. *Copy-Data Systems, Inc. v. Toshiba America, Inc.,* 663 F.2d 405, 408 (2nd Cir.1981). The hallmark of such a restraint is a collusion among competitors. *See Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348, 1354 (9th Cir.1982). When, however, a manufacturer acts on his own and imposes restrictions on the distributors of his product, such restraints are vertical in nature. "Vertical restraints are imposed by persons or firms further up the chain of distribution of a specific product (or in the rare cases, further down the chain) than the enterprise restrained." *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 295 (5th Cir. 1981).

In the present case, the restraints were imposed by Brandt on all the district managers. There is no evidence that the consent or acquiescence of the district managers was needed, sought or given. If a district manager attempted to ignore the restraints, Brandt retained the right to terminate its relationship with the offender. The Court must conclude that the restraints are vertical. *See, e.g., Sports Center, Inc. v. Riddell, Inc.,* 673 F.2d 786 (5th Cir.1982) (restraints imposed by manufacturer of sporting goods equipment on its dealers are vertical); *Barnosky Oils, Inc. v. Union Oil Co. of California,* 665 F.2d 74 (6th Cir.1981) (restraints imposed by oil company on its independent wholesalers are vertical); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.,* 637 F.2d 1376 (9th Cir.1981), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981) (restraints imposed by distributor of automobiles are vertical).

■ Plaintiff seeks to distinguish the case by asserting that as a district manager, he was in direct competition with Brandt in both sales and service. The evidence is, however, to the contrary. While Brandt maintained its contractual relationship with Gordon, Gordon was Brandt's exclusive representative for sales and service. Plaintiff's argument that it somehow competed with Brandt in the sale of used Brandt equipment is interesting as the contract specifically precluded Gordon from dealing in used equipment. Moreover, the import of such a finding of competition would not be significant. *See Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348, 1356–57 (holding that a dual distribution system would be tested under a rule of reason). *See also Abadir & Co. v. First Mississippi Corp.,* 651 F.2d 422 (5th Cir.1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001 (5th Cir.1980), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981) (dual distribution systems are vertical restraints since the source of the restriction is the manufacturer).

The Court finds that Gordon's horizontal claims fail as a matter of law. Therefore, Gordon's assertion of a group boycott, which necessarily involves a horizontal conspiracy, is without merit. *See Ron Tonkin Gran Turismo v. Fiat Distributors, Inc.,* 637 F.2d 1376, 1381–82 (9th Cir.1981), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981).

## THE REASONABLENESS OF THE RESTRAINTS:

■ The distinction between horizontal and vertical restraints of trade typically has significance in determining the standard under which a particular restraint is to be judged. *See Gough v. Rossmoor Corp.,* 585 F.2d 381, 387 (9th Cir.1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). Ordinarily, horizontal restraints are per se violations of Section 1 while vertical restraints are subject to the rule of reason. *See Cowley v. Braden Industries, Inc.,* 613 F.2d 751, 754 (9th Cir.1980), *cert. denied,* 446 U.S. 965, 100 S.Ct. 2942, 64 L.Ed.2d 824 (1981). Since horizontal restraints impact interbrand competition, they rarely have any purpose other than stifling competition. *See Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131 (2nd Cir.1978), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338, *rehearing denied,* 439 U.S. 1104, 99 S.Ct. 883, 59 L.Ed.2d 64 (1979). Vertical restraints, on the other hand, impact intraband competition and can promote interbrand competition. *See Continental T.V.,*

*Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 54–55, 97 S.Ct. 2549, 2559–2560, 53 L.Ed.2d 568 (1977). When a restraint is to be judged under the rule of reason, the challenger bears the burden of proving the unreasonableness of the particular restriction. *See Continental T.V., Inc. v. GTE Sylvania Inc.,* 694 F.2d 1132, 1137 (9th Cir.1982).

Gordon's remaining claims assert price fixing, restrictive territorial allocation, exclusive dealing and tying allegations. Plaintiff has, however, failed to prove that any of the restrictions of which he complains are unreasonable.

PRICE FIXING:

■ Price fixing, whether vertically or horizontally imposed, constitutes a per se violation of Section 1. *See A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302, 1305 (9th Cir.1981). Plaintiff contends that Brandt fixed the prices plaintiff could charge for the sale of new and reconditioned Brandt money processing equipment, used equipment and repair services. The Court has already found that it was proper for Brandt to require Gordon to charge the prices set by Brandt on its equipment. Gordon's other price fixing claims are without merit. Since plaintiff was prohibited from dealing in used equipment, Brandt could not fix prices. Moreover, the evidence established that plaintiff was at all times free to set his own prices for his repair services.

TERRITORIAL RESTRICTIONS:

■ Brandt restricted Gordon's sales activities to a specific territory. Within his territory, plaintiff was the exclusive Brandt salesperson. The absence of indicia that plaintiff was an entrepreneur in the sale of money processing equipment should preclude him from asserting this Section 1 challenge. Even if Gordon's claim is within the purview of Section 1, plaintiff has not shown the restriction is unreasonable. *See, e.g., Cowley v. Braden Industries, Inc.,* 613

F.2d 751, 754 (9th Cir.1980), *cert. denied,* 446 U.S. 965, 100 S.Ct. 2942, 64 L.Ed.2d 824 (1981); *First Beverages, Inc. of Las Vegas v. Royal Crown Cola Co.,* 612 F.2d 1164, 1169–70 (9th Cir.1980), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1981). *But see Continental T.V., Inc. v. GTE Sylvania Inc.,* 694 F.2d 1132, 1137 n. 9 (9th Cir.1982) (suggesting that a territorial restriction coupled with an exclusive right to sell might constitute a per se violation).

Under the rule of reason, the inquiry is whether the particular restraint promotes or suppresses competition. *See Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). A plaintiff must show more than an adverse effect on his own business. He must show an adverse impact on the competitive conditions in general as they existed within the field of commerce in which he was engaged. *DeVoto v. Pacific Fidelity Life Insurance Co.,* 618 F.2d 1340, 1343–45 (9th Cir.1980), *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1981). Brandt has developed an efficient and effective policy for the solicitation of orders for its equipment. Gordon has offered no evidence supporting his allegation that competition has been harmed by Brandt's policy and the Court must conclude that plaintiff has failed to meet his burden of proof. *See Sylvania,* 433 U.S. at 54–55, 97 S.Ct. at 2559–2560 (finding that vertical territorial restraints promote interbrand competition).

TYING AND EXCLUSIVE DEALING:

■ Gordon alleges that Brandt's contractual restrictions constitute impermissible exclusionary buying arrangements in the form of tying and exclusive dealing agreements. Tying and exclusive dealing agreements are prohibited by both Section 1 of the Sherman Act and Section 3 of the Clayton Act.[4] Plaintiff's claims concern a tie between the Brandt trademark and other Brandt products; and exclusive dealings involving the Brandt contract provision

---

4. The scope of Section 3 is limited to tangible goods and does not include services. *See Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1214 (9th Cir.1977). Considering that plaintiff's claims concern, for the most part,

services (the right to solicit orders for Brandt equipment and the right to perform Brandt authorized service work), Section 3 is of limited applicability to plaintiff's case.

which prevents Gordon from dealing in the equipment of Brandt's competitors, purchasing repair parts from sources other than Brandt, servicing other than Brandt equipment, and competing with Brandt for three years after termination as a district manager.

■ In order to establish the existence of an unlawful tying arrangement, the plaintiff must prove that: (1) there are two separate products involved, the sale of one (the tying product) being conditioned upon the purchase of the other (the tied product); (2) the seller has engaged in some modicum of coercive conduct toward the buyer; (3) the seller possesses economic power in the market for the tying product; and (4) a not insubstantial amount of commerce is affected by the challenged aggregation. *Hirsh v. Martindale-Hubbell, Inc.,* 674 F.2d 1343, 1346–47 (9th Cir.1982). Although tying is a per se violation of the antitrust laws, it will be permitted if the defendant can prove that the tie was implemented for a legitimate purpose and if no less restrictive alternative is available. *See Betaseed, Inc. v. U and I Inc.,* 681 F.2d 1203, 1215 (9th Cir. 1982); *Phonetele, Inc. v. American Telephone and Telegraph Co.,* 664 F.2d 716, 738–39 (9th Cir.1981). Gordon has, however, not established that the sale of one Brandt product was conditioned on the purchase of another.

■ Plaintiff's tying claims appear to be based on a connection between the Brandt trademark, which the Court assumes is the tying product, and the covenant not to compete, the requirement district managers sell and service exclusively Brandt equipment, and the requirement that plaintiff purchase only Brandt repair parts. Although a trademark may constitute a separate tying item, *see Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir. 1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), where the mark

merely identifies the source of the product and is inextricably interrelated with the product in the minds of the consumers, then it cannot support a tying claim. *See Hamro v. Shell Oil Co.,* 674 F.2d 784, 788 (9th Cir.1982); *Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348, 1353 (9th Cir. 1982). As in *Baskin-Robbins* and *Hamro,* the Brandt trademark merely serves to identify the source of the equipment sold. Moreover, under the facts of this case, it is unrealistic to view the trademark as an item separate from the entire Brandt district manager package of rights and restrictions.[5]

The heart of Gordon's complaint is the restriction Brandt placed on plaintiff's sales and service business. A Brandt district manager can only sell and service Brandt equipment. In exchange for this limitation, Gordon was granted the exclusive right to solicit sales for Brandt within his territory and the right to hold himself out as offering Brandt authorized service. While the existence of these restrictions is uncontested, whether they constitute unreasonable restraints of trade is another matter.

■ The rule of reason requires the fact-finder to focus directly on the challenged restraint's impact on competitive conditions. *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Plaintiff has offered only speculation as to the impact the limitations have on the competitive conditions as they exist in the sale and service of money processing equipment. *See Bob Maxfield, Inc. v. American Motors Corp.,* 637 F.2d 1033, 1036 (5th Cir.1981), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1982) (mere existence of an exclusive dealing clause does not violate the antitrust laws). Exclusive dealing arrangements often promote competition. *See Standard Oil Co. of Cal. v. United States,* 337 U.S. 293, 306, 69 S.Ct. 1051,

---

5. Beyond bare allegations, Gordon has failed to come forward with evidence establishing the existence of the other three tying elements. For example, no evidence was introduced suggesting repair parts for Brandt equipment were available from sources other than Brandt. If Brandt were the only source of repair parts, that would directly undercut any allegation of coercion.

1058, 93 L.Ed. 1371 (1949). In the light of this total absence of proof, the Court must conclude that Gordon has failed to establish a violation of the antitrust laws.[6]

## SECTION 2 OF THE SHERMAN ACT—MONOPOLY CLAIMS:

Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits monopolizations, attempts to monopolize and combinations or conspiracies to monopolize "any part of the trade or commerce among the several States ...." Gordon contends that Brandt has monopolized or has attempted to monopolize the sale and service of money processing equipment in the United States. The Court finds that plaintiff has failed to meet his burden of proving an actual or attempted monopolization.

## ACTUAL MONOPOLIZATION:

■ There are three essential elements to a charge of actual monopolization. First, the plaintiff must demonstrate that the defendant possesses monopoly power in the relevant market. Second, this monopoly power must be willfully acquired or maintained. Third, plaintiff must show causal "antitrust" injury. *California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727, 735 (9th Cir. 1979). *See Forro Precision, Inc. v. International Business Machines Corp.,* 673 F.2d 1045, 1058 (9th Cir.1982).

## MONOPOLY POWER:

■ Monopoly power is the power to control prices or exclude competition.

*United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Monopoly power can be determined only in the context of the relevant market in which the monopoly is claimed. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.,* 512 F.2d 1264, 1270 (9th Cir.1975), *appeal after remand,* 676 F.2d 1291 (9th Cir.1982). The relevant market consists of both the relevant product market (those products reasonably interchangeable with the product examined) and the relevant geographic market (the area where purchasers can reasonably turn to obtain the desired product). *See United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956). The test is a practical one, asking where and to what could purchasers realistically turn to satisfy their needs.

Gordon claims the relevant product markets are the sale and service of money processing equipment. The relevant geographic market is alleged to be the United States, with a separate submarket consisting of Washington and Oregon. The Court finds that the relevant product market consists of new, used and reconditioned money processing equipment.[7] The geographic market, the area where Gordon could realistically sell and service this equipment, appears to be limited to the States of Washington and Oregon.[8]

Under any definition of relevant market, plaintiff's evidence of monopoly power is

**6.** As discussed earlier, Section 3 of the Clayton Act is inapplicable to plaintiff's claims of exclusive dealings in services. Even if applicable, plaintiff has failed to meet his burden of proof. Gordon has made no showing as to what impact the restrictions have on the relevant market for the sale and service of money processing equipment. *See Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 329, 81 S.Ct. 623, 629, 5 L.Ed.2d 580 (1961) (discussing the factors necessary for a showing that a restraint could result in a substantial lessening of competition).

**7.** It is unclear whether Gordon has alleged that used and reconditioned money processing equipment constitute distinct submarkets from new money processing equipment. If such a

claim was made, it must be rejected. The evidence established, and plaintiff concedes in the pretrial order, that reconditioned and used money processing equipment are suitable substitutes for and compete with new money processing equipment.

**8.** Neither party effectively demonstrated the scope of the relevant geographic market. What the evidence did show was that plaintiff would rarely service equipment outside the States of Oregon and Washington even though there was no territorial restriction placed on his service business. Moreover, there was no evidence proffered indicating that plaintiff could somehow solicit sales for equipment on a national level.

wholly unconvincing. Gordon based his monopoly power claim on a purported demonstration of Brandt's market share and pricing policy. Because plaintiff's conclusions are based on unreliable data, the Court rejects Gordon's claim of monopoly power.

Plaintiff claims that Brandt possesses a stable and dominant share of the money processing equipment market; approximately 70% overall and up to 90% for certain pieces of equipment. Size is an indicator of monopoly power and market share data is highly relevant. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 924 (9th Cir.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). Plaintiff's market share data originated with the calculations of Mr. William Crane, a former Brandt employee, while Crane was working for Brandt. Crane would receive "competitive loss reports," reports made by Brandt district managers estimating the amount of sales made by Brandt competitors, and, after automatically doubling the number of reported sales by competitors (since Crane felt the sales activity was underreported), would compare the "revised" reports with Dun & Bradstreet reports. Based on his own "formula," Mr. Crane would then calculate market share. The Court finds Mr. Crane's calculations totally unsatisfactory. First, Crane could give no reason for the automatic doubling of the competitive loss reports except that he felt the reports underreported competitor activity. This automatic doubling destroys any statistical value the reports might have. Second, Mr. Crane was unable to describe his "formula" for integrating the Dun & Bradstreet reports, indicate any of the factors which went into the "formula," or explain how the Dun & Bradstreet reports were in any way used in the market share calculation. The Court must conclude that the market share data prepared by Mr. Crane and relied upon by plaintiff's expert

Dr. Leffler in formulating his opinion are too speculative and unreliable to be given any weight.

The second basis for asserting that defendant possessed monopoly power is Brandt's allegedly monopolistic profit level. The evidence, however, demonstrated that Brandt's profits were within the normal range. Moreover, profit evidence is often misleading and inconclusive, *see Transamerica Computer Co., Inc. v. International Business Machines Corp.,* 481 F.Supp. 965, 976 n. 22 (N.D.Cal.1979), and high profits can demonstrate defendant's superior product or reputation, as well as the existence of a monopoly.

The Court concludes that plaintiff's evidence of monopoly power is inadequate. Brandt's expert argued persuasively that Brandt's market share was not indicative of market power. The weight of the evidence demonstrates that Brandt's market share has been declining rapidly within the last few years. *See Greyhound Computer Corp. v. International Business Machines Corp.,* 559 F.2d 488, 496 n. 18 (9th Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978) (declining market share may reflect an absence of monopoly power). Vigorous competition with Brandt has been displayed. The addition of Gordon as a competitor of Brandt in the sale and service of money processing equipment can only assist the competitive forces. Without proof of monopoly power, all of plaintiff's actual monopolization claims fail as a matter of law.[9]

WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER:

Even assuming Brandt possessed monopoly power in the relevant market, the antitrust laws would not be violated. *See Borden, Inc. v. F.T.C.,* 674 F.2d 498, 512 (6th Cir.1982). A possessor of monopoly power violates the Sherman Act

---

**9.** Plaintiff offered no evidence supporting his allegation that Brandt monopolized the service industry. Instead, his argument was predicated on a finding that Brandt monopolized the sale of money processing equipment and therefore must have monopolized the service industry. The argument is, however, unfounded. Nothing has been demonstrated which would suggest that Brandt could employ its monopoly in one market, even if it had one, to obtain a monopoly in another market. Absent proof of monopoly power, Gordon's claim is rejected.

through "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966). A plaintiff need not show specific intent to eliminate competition, but he must demonstrate that the complained of acts were unreasonably restrictive of competition. *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 735–36 (9th Cir.1979).

Gordon contends that Brandt unlawfully acquired or maintained its monopoly by: (1) prohibiting its district managers from dealing in used equipment; (2) not allowing its district managers to buy equipment on their own behalf for resale; (3) refusing to sell repair parts to plaintiff on the same credit terms as it sells to its district managers; (4) refusing to provide plaintiff with service and repair manuals available to Brandt authorized service dealers; (5) planning the artificial obsolescence of its equipment by not manufacturing repair parts for equipment seven years after Brandt ceased to make the particular equipment; (6) eliminating competition through covenants not to compete; and (7) predatory pricing.

 Many of Gordon's allegations lack factual or logical support. There is no evidence that Brandt planned the artificial obsolescence of its equipment. Gordon has not shown that Brandt built its equipment to wear out or malfunction soon after purchase. Nor did plaintiff offer sufficient evidence to justify a finding that seven years after cessation of production was an unreasonable time to limit manufacture of repair parts. As for the claim that Brandt somehow owes a duty to its competitors to supply them with its service manuals, the claim is without merit. The lawful possession and retention of superior information regarding one's own products does not violate the antitrust laws. Just as Brandt is not required to open its service training program to its competitors, it need not provide its competitors with the service and repair manuals it has developed.[10]

## ANTITRUST INJURY:

 The antitrust laws were enacted for the protection of competition and not competitors. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Therefore, the injury complained of must be of the type the antitrust laws were designed to prevent and which flows from the alleged antitrust violations. Plaintiff has, however, failed to prove that any of Brandt's alleged activities has unreasonably impacted competition. Gordon has not shown that Brandt's refusal to permit him to deal in used and new money processing equipment on his own behalf,[11] Brandt's failure to manufacture repair parts seven years after ceasing to manufacture a particular line of equipment, the imposition of the

10. The Court rejects plaintiff's assertion that Brandt instituted a discriminatory credit policy once he was terminated as a district manager. As soon as Brandt was assured of plaintiff's credit, Gordon received his old credit terms.

11. Even if Brandt had monopoly power, not every refusal to deal would violate the antitrust laws. As a general rule, a company has a right to deal with whomever it chooses. *Associated Press v. United States*, 326 U.S. 1, 14–15, 65 S.Ct. 1416, 1421–1422, 89 L.Ed. 2013 (1945). Section 2 prohibits only those refusals to deal which under the particular circumstances of the case are unreasonably anticompetitive. *Mid-Texas Communications Systems, Inc. v. American Tel. & Tel. Co.*, 615 F.2d 1372, 1389 (6th Cir.1979), *cert. denied*, 449 U.S. 912, 101

S.Ct. 286, 66 L.Ed.2d 140 (1980). Plaintiff has not demonstrated Brandt's intent to monopolize, *see United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919) (discussing the intent test), nor that Brandt controls a scarce resource which it is not feasible for excluded competitors to duplicate (and therefore must give competitors access to the resource on a reasonable, non-discriminatory basis). *See United States v. Terminal Railroad Association of St. Louis*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912) (example of a "bottleneck" monopoly). *See generally Byars v. Bluff City News Co., Inc.*, 609 F.2d 843 (6th Cir. 1979). The Court has already determined that the particular refusals to deal are not violative of Section 1 of the Sherman Act.

covenant not to compete,[12] or not providing plaintiff with the repair manuals [13] has had any impact on the sale or service of money processing equipment. Vigorous competition and Brandt's declining market share describe the relevant market. Gordon's only real claim of injury is his own termination as a Brandt district manager. Instead of harming competition, this termination has resulted in the addition of a new competitor in the sale and service industry.

The Court must conclude that plaintiff has failed to meet his burden of proving monopoly power, unlawful acquisition or retention of that power or antitrust injury.

ATTEMPTED MONOPOLIZATION:

■ There are three elements of a § 2 claim of attempt to monopolize: (1) specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anticompetitive conduct directed toward accomplishing the unlawful purpose; and (3) a dangerous probability of success. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291, 1308 (9th Cir. 1982). As with all antitrust allegations, plaintiff must additionally demonstrate that the harm suffered is "antitrust" injury. *California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727, 736 (9th Cir.1979). The proof of each element may significantly overlap. *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1027–30 (9th Cir.1981).

Most of plaintiff's allegations have been adequately addressed by the Court.[14] Two claims, however, warrant closer examination. Gordon contends that through a policy of predatory pricing and service business acquisition, Brandt has attempted to monopolize the money processing equipment service industry. Gordon claims that Brandt has a secret plan to monopolize the servicing of Brandt equipment by opening its own field service offices and by purchasing the service businesses of district managers and others at very low prices. Plaintiff also claims that the field service office which Brandt opened after terminating him has drastically cut its prices in an effort to drive plaintiff out of the service business.

■ Acquisition of competing business, without more, is rarely considered predatory conduct. *See Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 271–72 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Plaintiff has not established coercion on the part of Brandt toward these service dealers to force them to sell their businesses. In fact, when Brandt offered to purchase plaintiff's service business, plaintiff declined the offer and remained in competition with Brandt. The claim is insufficient to establish specific intent to control prices or predatory conduct.

■ Gordon's predatory pricing claim is similarly without support. "Pricing is pred-

**12.** Brandt has not and will not enforce the covenant not to compete. Plaintiff has therefore not been damaged by it. Moreover, covenants not to compete, if limited in time and scope and if ancillary to the entire contract, are reasonable restrictions. *See American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230 (2nd Cir.1975).

**13.** Although Gordon contends that he will not be able to compete in the service industry without Brandt's repair manuals, the evidence is to the contrary. Other district managers have been terminated by Brandt and remain in competition with Brandt. Moreover, the relevant product market includes equipment other than Brandt equipment.

**14.** Plaintiff realleges his actual monopolization claims in support of his attempt to monopolize claim. Under its § 1 analysis, the Court has

found it permissible to require plaintiff to refrain from dealing in used equipment and equipment for resale, to stay in a specific territory, and to repair only Brandt equipment. Plaintiff has failed to demonstrate that Brandt's refusal to provide him with the service manuals or favorable credit terms has adversely impacted competition. Finally, given the total absence of proof of market power and the uncertainty in the proof of the relevant market, plaintiff's failure to prove predatory conduct or a per se violation of § 1 precludes his attempt to monopolize claim. *See M.A.P. Co., Inc. v. Texaco, Inc.,* 691 F.2d 1303 (9th Cir.1982); *Gough v. Rossmoor Corp.,* 585 F.2d 381 (9th Cir.1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979).

atory only where the firm foregoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup profits." *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 856 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). Price reductions that constitute a legitimate, competitive response to market conditions are entirely proper. *William Inglis,* 668 F.2d at 1014. While Gordon alleges that Brandt's prices are predatory, he has not demonstrated that the prices charged are below Brandt's marginal or average variable cost, *id.* at 1032–1038, or even below the prices charged by other Brandt field service offices.

As with his claim of actual monopolization, plaintiff has failed to meet his burden of proof.

DAMAGES:

■ Proof of damages is not a difficult standard under the antitrust laws. 15 U.S.C. § 15. "[A]n antitrust plaintiff is only obligated to provide the trier-of-fact with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations." *Moore v. Jas. H. Matthews & Co.,* 682 F.2d 830, 836 (9th Cir.1982). Plaintiff's damage evidence is, however, so speculative as to preclude him from recovering even if he had established a substantive violation of the antitrust laws.

Gordon's claim for damages is a projection of what he would have made as a Brandt district manager based on what he had made for a certain period of time. Even if Gordon had selected a correct time period from which to extrapolate, he failed to take into account that the alleged antitrust violations had both a positive and a negative impact on his earnings. In other words, if the alleged restrictions did violate the antitrust laws, as Brandt's exclusive sales representative within his territory his profits would have been unjustly higher than they would have been if competitive conditions existed. On the other hand, some of Brandt's restrictions, such as not allowing him to deal in used equipment, could work to his economic disadvantage. At no time did plaintiff provide the Court with any means to evaluate the competing factors in terms of his actual damages. The Court finds Gordon's damage evidence so fatally deficient as to preclude recovery even if an antitrust violation was proved.[15]

WASHINGTON FRANCHISE INVESTMENT PROTECTION ACT:

The Washington Franchise Investment Protection Act, RCW § 19.100.010 *et seq.,* is a comprehensive statute regulating the relationship between the franchisor and his franchisee. The Act imposes specific obligations on the franchisor and rights in the franchisee.[16] Plaintiff contends that he was a Brandt franchisee. The evidence, however, establishes that the parties were not in a franchise relationship.

■ A franchise is defined as an agreement by which a person grants to another a license to use a name which possesses a community interest in the distribution of goods and services for which the franchisee is required to pay, directly or indirectly, a franchise fee. RCW § 19.100.-010(4). A franchise fee is a charge paid for the right to enter into or continue a business under a franchise agreement. RCW § 19.100.010(11). Plaintiff claims that the money he paid when he assumed the Washington territory was a franchise fee.[17]

---

**15.** Plaintiff was not without means of proving his damages. He could have offered evidence as to what similarly situated salespeople have made in markets free of anticompetitive restraints.

**16.** The Act requires the franchisor to provide notice of his intent to terminate and to purchase the franchisee's stock in trade. RCW § 19.100.180(j).

**17.** There is no evidence that plaintiff did not pay fair market value for the items he was required to purchase from Brandt (repair parts, service instructions, etc.). Such payments are exempted from the definition of a franchise fee. *See* Chisom, *State Regulation of Franchising: The Washington Experience,* 48 Wash.L.Rev. 291, 342 (1974). *See generally American Oil Co. v. Columbia Oil Co., Inc.,* 88 Wash.2d 835, 841, 567 P.2d 637 (1977) (approving the Chisom definition).

When Gordon assumed the Washington territory, he entered into a contract with the former Brandt district manager, David Wildenberg, through which he paid Wildenberg $10,000 for "business records and goodwill," $3,425 for payment to a service representative and for parts and tools, and $425 for commissions on unbilled maintenance agreement contracts. Plaintiff assumed all the business's responsibilities and Wildenberg promised not to barter or sell to any other person the information Wildenberg had acquired regarding the accounts he had serviced for a period of one year. There is evidence that Brandt encouraged plaintiff to purchase Wildenberg's service business. There is, however, no evidence that any fee was paid to anyone for the right to sell Brandt equipment. Nor is there any evidence that plaintiff did not in fact purchase what the contract provided for: David Wildenberg's independent service business and a promise from Wildenberg not to use his information in competition with Gordon for one year. The record is clear that plaintiff believed he had purchased a valuable right. At one point, Gordon engaged counsel to write to Wildenberg and inform him that "[t]he Buy-Sell Agreement executed by [you] and Mr. Gordon does not involve Brandt, Inc. as a party and must, out of necessity, be resolved entirely apart from Brandt, Inc.," and that Gordon fully intended to enforce the agreement for which he paid.

The Court finds that the payment to Mr. Wildenberg was not a franchise fee, that plaintiff was not a franchisee in the sale or service of Brandt equipment and that the Washington Franchise Investment Act is inapplicable to his claims.

**BRANDT'S COUNTERCLAIM:**

▇ Brandt seeks to recover the commissions it has paid to plaintiff for the sales of equipment to Portland and Oregon Publications. Defendant contends that as a condition precedent to payment of the commissions plaintiff was required to abide by the sales restrictions. Moreover, retention of the commissions by Gordon would allegedly constitute unjust enrichment.

The Court disagrees with defendant's assertions. The contractual restrictions which Brandt has characterized as conditions precedent are instead bargained for consideration.[18] The evidence demonstrated that Gordon has breached his contract with Brandt and that Brandt is entitled to damages. Brandt has not, however, established the nature and extent of its damages. Defendant's claim that it has been injured to the full extent of the commissions paid to Gordon is not supported. Brandt received the appropriate payment for equipment actually sold. Absent proof of the extent of damages suffered by Gordon's breach of the sales contract, a damage award is not appropriate. The Court further finds that defendant's damage claim based on alleged injury to its demonstrator equipment in Gordon's possession has not been proven. However, to the extent plaintiff retains customer remittances owing to Brandt, plaintiff was without authority to withhold those funds from Brandt and must return those funds plus applicable interest from the date those funds were owing. The Court has calculated the amount of funds owing, notwithstanding interest, as $17,624.41.

**18.** The distinction is between a condition and bargained for consideration. A condition creates no right or duty in itself. *See United States v. Schaeffer,* 319 F.2d 907 (9th Cir.1963). A condition "is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement (Second) of Contracts, § 224. Consideration, on the other hand, is something actually bargained for and given in exchange. *See Huberdeau v. Desmarais,* 79 Wash.2d 432, 486 P.2d 1074 (1971). Whether a provision in a contract is a condi-

tion, the nonfulfillment of which results in a forfeiture, or bargained for consideration, the breach of which results in a right to damages, depends on the intent of the parties as manifested in their agreement. *See Ross v. Harding,* 64 Wash.2d 231, 236, 391 P.2d 526 (1964). Conditions are not favored by the courts, *Fischler v. Nicklin,* 51 Wash.2d 518, 523, 319 P.2d 1098 (1958), and if any doubt exists, the term should be construed as consideration. *See Prager's, Inc. v. Bullitt Co.,* 1 Wash.App. 575, 584, 463 P.2d 217 (1969).

CONCLUSION:

For the above stated reasons, the Court hereby finds and rules as follows:

1. Plaintiff has failed to establish any violations of Sections 1 and 2 of the Sherman Act and of Section 3 of the Clayton Act.

2. Even if the antitrust laws were violated, plaintiff has failed to establish his damages.

3. The Washington Franchise Investment Protection Act is inapplicable to plaintiff's claims since the parties have not entered into a franchise relationship.

4. Plaintiff may retain the commissions earned on the sale of equipment to Portland and Oregon Publications but must remit to Brandt $17,624.41 plus interest.

Counsel for defendant are directed to prepare a form of Judgment in accordance with this Memorandum Opinion. Any Findings or Conclusions omitted from the Court's Findings of Fact and Conclusions of Law but found in this Memorandum Opinion are hereby incorporated by reference.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiff Laurence J. Gordon is an individual currently residing in Woodinville, Washington.

2. Plaintiff Laurence J. Gordon, Inc. is a Washington corporation wholly-owned by Laurence Gordon. It has its principal place of business in Woodinville, Washington, and does business in the states of Washington and Oregon.

3. Plaintiff Advanced Money Processing Systems, Inc. is a Washington corporation wholly-owned by Laurence Gordon and has its principal place of business in Woodinville, Washington. It does business in Washington and Oregon.

4. Defendant Brandt, Inc. is a Wisconsin corporation with its principal place of business in Watertown, Wisconsin.

5. Defendant Brandt Systems, Inc. was a Wisconsin corporation wholly-owned by Brandt, Inc. and had its principal place of business in Watertown, Wisconsin. On December 13, 1981, Brandt Systems, Inc. was merged into Brandt, Inc.

6. Brandt manufactures and sells equipment for the handling and processing of money, both coin and currency, and money-related documents, as well as repair parts for use on Brandt equipment. Brandt money processing equipment includes reconditioned equipment of its own manufacture which it has taken in trade or which it has used as demonstrator and loaner equipment. Brandt also sells paper products (coin wrappers, bill straps, paper rolls) for use with its equipment.

7. Brandt sells its products throughout the United States to end-user customers through a system of "district managers."

8. A Brandt district manager is not an employee of Brandt. He is an independent salesman who is granted the right to solicit orders for Brandt equipment. A district manager does not sell equipment on his own behalf but merely forwards orders to Brandt from end-user purchasers. If Brandt accepts the order, it will pay the district manager a commission at the rate set by Brandt.

9. District managers have their own sales force and are responsible for their own operating expenses.

10. All district managers sign a standard sales agreement prepared by Brandt. The agreement provides that the district manager: (1) is the exclusive Brandt sales representative in his assigned territory; (2) must devote his entire time to the sale of Brandt money processing equipment, except for operating an authorized Brandt service business; (3) can solicit sales only at the prices set by Brandt; (4) cannot deal in Brandt equipment on his own behalf; (5) cannot deal in used equipment and must return to Brandt all equipment he receives

as trade-ins; (6) can solicit sales for Brandt only on Brandt order forms or on forms approved by Brandt; and (7) upon termination must return Brandt's demonstrator/loaner equipment.

11. Brandt sells its paper products to end-users through orders solicited by Brandt district managers. Brandt also sells paper products to independent dealers not associated with Brandt. Limited quantities of paper products are sold to district managers for emergency customer needs. District managers are not otherwise permitted to deal in Brandt paper products on a routine basis.

12. There are two types of authorized repair services for Brandt equipment. In some parts of the country, Brandt owns and operates its own field service offices. Alternatively, Brandt permits some of its district managers to hold themselves out for Brandt authorized service.

13. A district manager's service business is wholly independent from Brandt. A district manager sets his own prices and is not limited to any geographic territory. Brandt, however, will not reimburse for Brandt warranty work done outside of a district manager's assigned territory.

14. Brandt does place certain limitations on a district manager's service business. A district manager must service only Brandt equipment, use Brandt repair parts and be factory trained by Brandt.

15. Brandt sells its repair parts to both district managers and independent service companies on identical terms of sale.

16. In 1975, Gordon was a member of the Oregon district manager's sales force.

17. On March 6, 1976, Gordon became the Oregon district manager. His territory was later expanded when he became the district manager for portions of Oregon and Washington on January 1, 1978. Gordon was permitted to operate a Brandt authorized service business.

18. For tax reasons and with the knowledge and consent of Brandt, Gordon assigned his rights under the sales agreement to his wholly-owned corporation Laurence J. Gordon, Inc., and his rights under the service agreement to his wholly-owned corporation Advanced Money Processing Systems, Inc. The assignments in no way changed Gordon's relationship with Brandt.

19. Gordon did not directly or indirectly pay anything for the right to sell and service Brandt equipment. Gordon did purchase the independent service business of the former Washington district manager, David Wildenberg, for $13,850 ($10,000 for business records and good will, $3,425 for payment to a service representative and for parts and tools, and $425 for commissions on unbilled maintenance agreement contracts). Gordon assumed all the business's responsibilities and Wildenberg promised not to barter or sell to any other person the information he had acquired regarding the accounts he had serviced for a period of one year.

20. Gordon operated his service and sales business until he was terminated as a Brandt district manager on May 5, 1981. His service agreement was also terminated on that date.

21. Upon his termination as a Brandt district manager, and in violation of the sales agreement, Gordon refused to return Brandt's demonstrator/loaner equipment in Gordon's possession. The equipment was returned upon order of this Court on March 26, 1982.

22. Gordon retains funds which belong to Brandt for sales solicited by Gordon: Seattle Trust and Savings Bank ($7,972.46); First National Bank ($675.00); Northwestern Commercial Bank ($3,762.95) and Portland Publications ($5,214.00).

23. Brandt has set up its own field service office in Washington.

24. Gordon remains in the money processing equipment service and sales business. He sells on his own behalf money processing equipment obtained from Brandt's competitors and services all money processing equipment. He does not, however, hold himself out as providing Brandt authorized service and does not sell Brandt equipment.

25. Gordon created Portland and Oregon Publications, companies whose sole purpose was to acquire Brandt equipment to be resold by Gordon. Gordon submitted "orders" from these companies under the fictitious names of Dave Standard and M. Taylor. Gordon signed the order forms himself but attempted to disguise his handwriting by using different colored pens and by slanting the "signators'" writing on a different angle. This was contrary to the terms of his contract with Brandt.

26. Gordon also wrongfully acquired Brandt equipment for resale by submitting purchase orders in the name of Brandt's end-user customers. This was contrary to the terms of his contract with Brandt.

27. Gordon wrongfully submitted orders for paper products through AAccurate Coin Systems, a company owned by Gordon's brother. Gordon then resold the paper products on his own behalf. This was contrary to the terms of his contract with Brandt.

28. On at least one occasion Gordon sold equipment outside his territory. This was contrary to the terms of his contract with Brandt.

29. Gordon signed customer names to Brandt order forms. This was contrary to the terms of his contract with Brandt.

30. At no time did Brandt know of, consent to, or acquiesce in Gordon's violating the terms of the sales agreement.

31. Gordon contends that Brandt violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Gordon has not, however, proven any of these claims.

32. Gordon claims Brandt violated Sections 1 and 3 by (1) price fixing; (2) restrictive territorial allocation; (3) exclusive dealing; (4) tying; and (5) group boycott.

33. To the extent Gordon challenges the restrictions Brandt placed on the sale of its money processing equipment, Gordon's claims are without merit because Gordon is not sufficiently independent from Brandt. Gordon lacks the indicia of an entrepreneur in the sale of Brandt money processing equipment and paper goods. Under the terms of the sales agreement he never had title to nor assumed the risk of loss of the equipment. All the entrepreneurial costs of doing business were borne by Brandt. Gordon's only costs were those of a salesman.

34. All restraints imposed by Brandt were vertical in nature.

35. Gordon has failed to prove that any of the restraints were unreasonable. Gordon has also failed to prove the existence of a tying arrangement. The Brandt trademark serves to identify the source of the goods and is not a separate product for tying purposes.

36. Gordon has failed to prove his Section 2 monopolization claims. Gordon did not establish that Brandt possesses monopoly power in the relevant market. The relevant product market consists of new, used and reconditioned money processing equipment. The relevant geographic market was not established but appears to be the states of Washington and Oregon. Gordon's market share data were unreliable. The market for money processing equipment appears to be a competitive one and Brandt's market share appears to be declining. Gordon's allegations of a willful maintenance or acquisition of monopoly power were similarly unsupported. Finally, Gordon failed to prove that any of the alleged violations caused antitrust injury.

37. Gordon failed to prove his attempt to monopolize claims. The predatory pricing allegation is without factual support. The acquisition of service businesses by Brandt has not been proven to be predatory conduct.

38. Gordon failed to provide a reasonable basis to calculate his damages without undue speculation even if an antitrust violation were established. No method of evaluating the economic advantages and disadvantages of the challenged restraints was given.

39. Gordon was not a franchisee of Brandt's in either the sale or service of money processing equipment.

40. Gordon did not pay a franchise fee to anyone. The moneys paid to Brandt for

repair parts and training were at the fair market value for those products and services. The money paid to Dave Wildenberg was not a franchise fee.

41. Although Gordon breached his contract with Brandt, Brandt did not prove the extent of its damages caused by Gordon's breach.

42. Gordon is entitled to the commissions earned on the sales to Portland and Oregon Publications. Gordon cannot, however, retain the funds wrongfully withheld from Brandt for the orders he had solicited for Brandt.

## CONCLUSIONS OF LAW

### Section 1 of the Sherman Act and Section 3 of the Clayton Act

1. Section 1 prohibits "every contract, combination . . . , or conspiracy, in restraint of trade."

2. In order to violate Section 1, there must be two or more actors. Restraints imposed on individuals who lack the indicia of an entrepreneur are outside the scope of the statute.

3. Where the source of the restriction is the manufacturer who acts on his own, the restraints are vertical in nature.

4. Vertical restraints, except for tying and price fixing, violate Section 1 only if they are proven to be unreasonable restraints of trade. The inquiry is whether the particular restraint promotes or suppresses competition. The plaintiff has the burden of proving the unreasonableness of the restraint.

5. In order to establish the existence of an unlawful tying arrangement, the plaintiff must prove that: (1) there are two separate products involved, the sale of one (the tying product) being conditioned on the purchase of the other (the tied product); (2) the seller has engaged in some modicum of coercive conduct toward the buyer; (3) the seller possesses economic power in the market for the tying product; and (4) a not insubstantial amount of commerce is affected by the challenged aggregation. A tie, while a per se violation of the antitrust laws, will be permitted if the defendant proves the tie was implemented for a legitimate purpose and if no less restrictive alternative exists.

6. A trademark may constitute a separate product for tying purposes if it does more than identify the source of the product and is not inextricably interrelated in the minds of the consumers with the product.

7. Section 3 of the Clayton Act prohibits the leasing or sale of a good on condition that the purchaser not deal in or use the goods of a competitor where the effect of such lease or sale may be to substantially lessen competition or tend to create a monopoly. Section 3 does not apply to services. The focus is on the impact of the restraint on the relevant market.

8. Gordon has failed to establish any of his Section 1 or Section 3 allegations.

### Section 2 of the Sherman Act

9. Section 2 prohibits monopolization, attempt to monopolize and combination or conspiracy to monopolize any part of the trade or commerce among the several States.

10. To establish a claim of actual monopolization, a plaintiff must prove: (1) the defendant possesses monopoly power in the relevant market; (2) the monopoly power was willfully acquired or maintained; and (3) antitrust injury.

11. Monopoly power is the power to control prices or exclude competition.

12. The relevant product market consists of all those products reasonably interchangeable with the product examined, and the relevant geographic market consists of the area in which purchasers can reasonably turn to obtain the desired product. Market share data is relevant in proving monopoly power.

13. Possession of monopoly power does not violate the antitrust laws. The power must be willfully acquired or maintained.

14. Antitrust injury is the type of injury the antitrust laws were designed to prevent and which flows from the alleged antitrust violations.

15. In order to establish an attempt to monopolize claim, a plaintiff must demonstrate: (1) specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anticompetitive conduct directed toward accomplishing the unlawful purpose; (3) a dangerous probability of success; and (4) antitrust injury.

16. Pricing is predatory only where the firm foregoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup profits. Predatory pricing is typically established by showing that the defendant was charging below his marginal or average variable cost.

17. A plaintiff must prove that the complained of activity was unreasonable.

18. Gordon has failed to establish any Section 2 violation.

*Antitrust Damages*

19. An antitrust plaintiff must provide the trier of fact with some basis from which to reasonably estimate, without undue speculation, the damages flowing from the antitrust violations.

20. Plaintiff has failed to provide a reasonable basis for calculating his damages.

*Washington Franchise Investment Protection Act*

21. A franchise is an agreement by which a person grants to another a license to use a name which possesses a community interest in the distribution of goods and services for which the franchisee is required to pay, directly or indirectly, a franchise fee.

22. Payments at the fair market value for goods actually received do not constitute a franchise fee.

23. The relationship between Gordon and Brandt was not a franchise within the meaning of the Washington Franchise Investment Protection Act.

*Breach of Contract*

24. A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due. Considera-tion is something actually bargained for between the parties.

25. Conditions are disfavored and, if doubt exists, terms should be construed as consideration and not as conditions.

26. In order to recover on a breach of contract claim, a claimant must prove his damages suffered by the breach.

27. Brandt did not prove its damages caused by Gordon's breach.

28. Gordon may not retain funds owing to Brandt for sales of Brandt equipment.

The Clerk of this Court is instructed to send uncertified copies of these Findings of Fact and Conclusions of Law to all counsel of record. If additional Findings or Conclusions are found in the Court's Memorandum Opinion which are not present in these Findings and Conclusions, they are hereby incorporated by reference.