[No. 44602. En Banc. July 28, 1977.]

AMERICAN OIL COMPANY, *Respondent,* v. COLUMBIA
OIL CO., INC., *Appellant.*

Richard H. Bennett (of Bennett & Carroll), for appellant.

Walter G. Meyer, Jr. (of Halverson, Applegate & McDonald), for respondent.

STAFFORD, J.—Respondent American Oil Company (American) sued Columbia Oil Co., Inc. (Columbia) for an unpaid debt. Columbia counterclaimed on several grounds alleging wrongful termination of their sales contract by American. The original action for debt was settled by stipulation, and trial was had on only one of Columbia's counterclaims. Columbia appeals from a jury verdict in favor of American and subsequent judgment dismissing Columbia's

counterclaims. The case was certified to this court by the Court of Appeals. We affirm the trial court.

Colin Bleiler, Sr., was the sole proprietor of a petroleum products distributorship in Richland, Washington, from 1949 to 1971. Essentially, he was an independent contractor who operated a bulk plant and trucks and distributed certain petroleum products to a number of service stations, three of which he owned. Mr. Bleiler was supplied by Signal Oil Company from 1949 until 1968 when he terminated his contract with Signal and entered into a jobber sales contract with American. As part of the original contract negotiations, American promised to paint three of Mr. Bleiler's trucks. This commitment was never fulfilled.

In 1971, Mr. Bleiler took steps to transfer the business to his son, Colin Bleiler, Jr., who had been managing the business for him since 1967. On December 21, 1971, Colin Bleiler, Sr., incorporated his sole proprietorship as Columbia Oil Co., Inc., and on January 1, 1972, Colin Bleiler, Jr., became the sole owner and stockholder.

At the time of incorporation, Columbia had been doing business with American under a jobber sales contract dated April 15, 1969. This contract was cancelled on December 21, 1971, the date of incorporation, and a new jobber sales contract was executed at the request of Colin Bleiler, Jr. The new contract was basically the same as the prior contracts with American: the agreement was for a basic period of 1 year renewable thereafter for ten 1–year terms. Either Columbia or American was entitled to terminate the contract at the end of a term by giving 60 days' written notice.

On July 5, 1972, American notified Columbia that it would terminate the contract December 31, 1972, the end of that current term. It stated that there was a "product availability" problem in the area. Columbia contracted with Mobil Oil as its new supplier, commencing on January 1, 1973. Consequently, Columbia was not without a supplier at any time. It is of note that Columbia enjoyed a greater profit with Mobil than it had when American was its supplier.

American's original suit against Columbia was for payment of oil company products purchased from American between April 1, 1972, and January 1, 1973. Columbia's answer admitted the existence of a debt but disputed the amount. Columbia also contended that American had wrongfully terminated the contract and counterclaimed for violation of the Consumer Protection Act, RCW 19.86; for violation of the Franchise Investment Protection Act, RCW 19.100; for violation of RCW 62A.2–615 of the Uniform Commercial Code (UCC); for breach of contract; for the truck–painting debt; and for American's failure to buy back materials under the franchise act.

American moved for summary judgment, contending it had a right to terminate the contract and did so properly on July 5, 1972. The trial court entered a partial summary judgment which incorporated the parties' stipulation as to the amount of the debt and which allowed Columbia to litigate its counterclaims. Before trial, the court issued a memorandum decision which permitted appellant to proceed under the Consumer Protection Act claim but not under either the Franchise Investment Protection Act or the UCC. The jury found American not guilty of unfair or deceptive acts and practices under the Consumer Protection Act. The court dismissed Columbia's counterclaims and denied its motions for judgment n.o.v. and in the alternative for a new trial.

■.Appellant Columbia first contends that American's termination of the contract violated RCW 62A.2–615[1] of

---

[1]RCW 62A.2–615:

"Excuse by failure of presupposed conditions. Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:

"(a) Delay in delivery or non–delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non–occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or

the UCC. This section of the UCC excuses a seller from timely delivery of goods contracted for when his performance has become commercially impracticable because of unforeseen supervening circumstances not within the contemplation of the parties at the time of contracting. *Uniform Commercial Code,* U.L.A. § 2–615, at 335 (Master ed. 1976). But, subparagraph (b) provides that when only part of a seller's capacity to perform is affected, he must allocate deliveries among his customers fairly and reasonably. Columbia contends that subparagraph (b) required American, when faced with a product shortage, to allocate its limited supplies fairly among all its jobbers rather than terminate its contract with Columbia. We do not agree. This section of the statute does not apply to the termination of a contract by either the buyer or seller; rather, it applies to a situation where it becomes impossible or impracticable for a seller to perform during the existence of a contract. RCW 62A.2–615 is meant to be asserted as a defense by a seller who is unable to deliver due to unforeseen circumstances and as a consequence has been sued by the buyer for breach of contract. In fact, the statute is located in the Breach, Repudiation, and Excuse section of the UCC and creates a defense rather than a substantive right. *Uniform Commercial Code, supra* at 335. Thus, RCW 62A.2–615 has no application to American's right to terminate its contract with Columbia.

If Columbia was dissatisfied with American's allocation prior to American's termination of the contract, it failed to give timely notice of that fact as required by RCW 62A.2–

---

domestic governmental regulation or order whether or not it later proves to be invalid.

"(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

"(c) The seller must notify the buyer seasonably that there will be delay or non–delivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer. [1965 ex.s. c 157 § 2–615.]"

616.[2] The fact that Columbia agreed to American's allocation of oil products during the existence of the contract precludes this belated resort to the statute.

Appellant next assigns error to the trial court's refusal to allow the jury to consider whether American's termination of the jobber sales contract violated the Franchise Investment Protection Act, RCW 19.100. Under that chapter a business which distributes products of another has a franchise if two requirements are met: (1) the agreement between the parties includes a license to the franchisee to use a trademark or "related characteristic" of the franchisor, and (2) the franchisee pays a "franchise fee." RCW 19.100.010(4). We have not as yet had an opportunity to consider the meaning of "franchise fee" as used in RCW 19.100.010(11);[3] however, an article written soon after the passage of the Franchise Investment Protection Act provides us with some guidance:

---

[2]RCW 62A.2-616:

"Procedure on notice claiming excuse. (1) Where the buyer receives notification of a material or indefinite delay or an allocation justified under the preceding section he may by written notification to the seller as to any delivery concerned, and where the prospective deficiency substantially impairs the value of the whole contract under the provisions of this Article relating to breach of installment contracts (RCW 62A.2-612), then also as to the whole,

"(a) terminate and thereby discharge any unexecuted portion of the contract; or"

[3]RCW 19.100.010(11)

"'Franchise fee' means any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for the mandatory purchase of goods or services or any payment for goods or services available only from the franchisor, or any training fees or training school fees or charges; however, the following shall not be considered payment of a franchise fee: (a) the purchase or agreement to purchase goods at a bona fide wholesale price; (b) the purchase or agreement to purchase goods by consignment; if, and only if the proceeds remitted by the franchisee from any such sales shall reflect only the bona fide wholesale price of such goods; (c) a bona fide loan to the franchisee from the franchisor; (d) the purchase or agreement to purchase goods at a bona fide retail price subject to a bona fide commission or compensation plan that in substance reflects

"Franchise fee" is then defined in an elaborate fashion to include generally any capital investment fee, royalty–type payment, payment for the mandatory purchase of goods or services, training or training school fee or other payment. Excluded from the definition of "franchise fees" are amounts realized from purchases or leases of property at a fair market or rental value and from bona fide wholesale transactions.

Chisom, *State Regulation of Franchising: The. Washington Experience,* 48 Wash. L. Rev. 291, 342 (1973).

Columbia paid American for tires, batteries, accessories, and fuel oils actually purchased by it. Appellant also rented a sign and credit card imprinter from American. These purchases and rental charges are specifically excluded from the definition of a "franchise fee." *See* RCW 19.100-.010(11)(a), (e). Consequently, there was no payment of a "franchise fee" by Columbia to American. The trial court correctly held that there were no facts to support a claim that appellant had a franchise with respondent. As a matter of law the Franchise Investment Protection Act was inapplicable.[4]

▄ Next, appellant argues that the trial court erred by refusing to allow the jury to consider specific items of damages allegedly sustained by Columbia. If error was committed by excluding evidence of certain damages, it could have had no effect upon the jury's conclusion that American was

---

only a bona fide wholesale transaction; (e) the purchase or lease or agreement to purchase or lease supplies or fixtures necessary to enter into the business or to continue the business under the franchise agreement at their fair market or rental value; (f) the purchase or lease or agreement to purchase or lease real property necessary to enter into the business or to continue the business under the franchise agreement at the fair market or rental value; (g) amounts paid for trading stamps redeemable in cash only; (h) amounts paid for trading stamps to be used as incentives only and not to be used in, with, or for the sale of any goods." (Italics ours.)

[4]Of particular interest is the fact that S.B. 2313, presently pending before the legislature of the State of Washington, would amend the Franchise Investment Protection Act to apply to agreements granting service station dealers the right to sell gasoline under the supplier's trademark. This proposed legislation reinforces our view that the franchise act, as presently enacted, does not apply to jobber sales contracts between oil companies and private corporations.

not *liable* for unfair or deceptive acts or practices under RCW 19.86, the Consumer Protection Act. Inasmuch as the result would not have been changed by the alleged error, we do not consider Columbia's assignment of error in regard to items of damage. Error relating solely to the issue of damages is harmless when a proper verdict reflects nonliability. *Stuart v. Consolidated Foods Corp.,* 6 Wn. App. 841, 845, 496 P.2d 527 (1972); *see also Larson v. Puyallup School Dist. 3,* 7 Wn. App. 736, 502 P.2d 1258 (1972).

■ Columbia claims the trial court erred by failing to give its proposed instruction No. 13 and by the giving of instruction No. 14 in its stead. The sole reason given for the exception was that the proposed instruction was "taken from the recommended instructions from the American Bar Association Anti–Trust Jury Instructions" and appellant felt it was "more appropriate." Such an exception is wholly inadequate to support an assignment of error on appeal. A trial court's giving or refusal to give a proposed instruction will not be considered on appeal unless counsel has informed the trial court of the point of law involved and the reasons for the exception. CR 51(f); *Tunney v. Seattle Mental Health Rehab. Inst.,* 83 Wn.2d 695, 521 P.2d 932 (1974); *Kjellman v. Richards,* 82 Wn.2d 766, 514 P.2d 134 (1973); *State v. Scott,* 77 Wn.2d 246, 461 P.2d 338 (1969); *Moore v. Mayfair Tavern, Inc.,* 75 Wn.2d 401, 451 P.2d 669 (1969).

■ Appellant also assigns error to the trial court's failure to give its proposed instruction No. 16. Once again we note a failure of counsel to inform the trial court of the point of law involved and the reasons for the exception. As indicated in the preceding paragraph we will not consider a trial court's failure to give a proposed instruction unless counsel has informed the trial judge of the point of law involved and the reasons for the exception. CR 51(f); *Tunney v. Seattle Mental Health Rehab. Inst., supra; Kjellman v. Richards, supra; State v. Scott, supra; Moore v. Mayfair Tavern, Inc., supra.* Concerning this problem appellant's reply brief merely comments "the transcript

would appear to be incomplete as there is a break in the sentence . . ." Without actually claiming that a proper reason was given, an inference is injected that one might have been given. We will not accept such a suggestion in place of a statement of facts actually certified by the trial judge, where no attempt has been made to amend or correct it. *Lyle v. Heidner & Co.,* 45 Wn.2d 806, 278 P.2d 650 (1954). Alleged errors respecting requested instructions not actually appearing in a statement of facts will not be considered on appeal. *Kent v. Whitaker,* 58 Wn.2d 569, 364 P.2d 556 (1961).

 Finally, appellant assigns error to the trial court's having given instruction No. 11. In essence the instruction stated that a provision in a contract which provides for termination by either party upon giving 60 days' notice is legal. Appellant does not challenge the instruction as an incorrect statement of the law. Rather, he argues that the instruction should have been more restricted in scope under the facts of this case. Appellant contends that by the failure to limit an otherwise correct statement of the law, the jury could have concluded that American had not violated RCW 19.86.020, which prohibits unfair business practices. It must be noted, however, that appellant did not propose another instruction that either restricted instruction No. 11 or better delineated the context of the business relationship between the two companies. Thus, the assignment of error is not well taken.

> When an instruction to be given by the trial court is a correct statement of the law but is objected to as too broad or as insufficiently specific under the evidence, the objecting party must propose a proper instruction on the subject. Reversible error is not present unless the preferable instruction has been submitted and has been refused.

*Harris v. Burnett,* 12 Wn. App. 833, 843, 532 P.2d 1165 (1975), citing *Heitfeld v. Benevolent & Protective Order of Keglers,* 36 Wn.2d 685, 220 P.2d 655, 18 A.L.R.2d 983 (1950). *See also Martin v. Huston,* 11 Wn. App. 294, 522

844

P.2d 192 (1974). This court has consistently held that error cannot be assigned on the ground that an instruction should have been more specific or complete, unless the appellant has proposed instructions which were refused. A mere exception to an instruction will not preserve error on appeal because of alleged nondirection. *Heitfeld v. Benevolent & Protective Order of Keglers, supra; White v. Burke,* 31 Wn.2d 573, 583, 197 P.2d 1008 (1948); *Harris v. Burnett, supra* at 843.

We affirm the trial court on all assignments of error.

WRIGHT, C.J., and ROSELLINI, HAMILTON, UTTER, BRACHTENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.