721 F.2d 1207
 1984-1 Trade Cases 65,765
 Jerry A. BLANTON, Plaintiff-Appellee/Cross-Appellant,
v.
MOBIL OIL CORPORATION, a corporation,
Defendant-Appellant/Cross-Appellee.
Roy H. HEALEY, Plaintiff-Appellee/Cross-Appellant,
v.
MOBIL OIL CORPORATION, a corporation,
Defendant-Appellant/Cross-Appellee.
 Nos. 82-3359, 82-3394.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 6, 1983.
Decided Dec. 13, 1983.
 
 Robert H. Alsdorf, Kenneth Shear, Armstrong & Alsdorf, Seattle, Wash., for defendant-appellant/cross-appellee.
 Stephen R. Morris, Jack D. Fudge, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for plaintiff-appellee/cross-appellant.
 Appeal from the United States District Court for the Western District of Washington.
 Before WRIGHT, CHOY and NELSON, Circuit Judges.
 CHOY, Circuit Judge:
 
 
 1
 Jerry Blanton and Roy "Bud" Healey, the plaintiffs below, are former operators and lessees of service stations located in Seattle and owned by defendant Mobil Oil Corporation. Blanton was a Mobil dealer from August 30, 1973, until October 8, 1976. Healey operated his Mobil station from February 19, 1974, until March 8, 1977. Both dealers sued Mobil contending that during their respective tenures, Mobil damaged their businesses in violation of the Sherman Act, 15 U.S.C. Secs. 1, 2, section 3 of the Clayton Act, 15 U.S.C. Sec. 14, the Washington Consumer Protection Act, Wash.Rev.Code Sec. 19.86.010 et seq.,[1] and the Washington Franchise Investment Protection Act ("FIPA"), Wash.Rev.Code Sec. 19.100.010 et seq. They further alleged in diversity that their individual terminations as Mobil dealers involved fraud and breach of contract under Washington law.
 
 
 2
 After a lengthy trial, the jury returned special verdicts in favor of both plaintiffs. The jury found that Blanton had suffered $134,585 in antitrust damages and $94,628 in other damages. Healey was found to have sustained $19,967 in antitrust damages and $11,144 in other damages. By special verdict, the jury found that both Blanton and Healey had been subjected to unlawful tying arrangements, attempted monopolization, breach of contract, and fraud. The jury also found that Blanton had been a victim of coerced resale price maintenance and a group boycott aimed at his separate retail operations. Mobil's post-trial motions for judgment n.o.v. or new trial were denied. Mobil appeals the antitrust and contract/fraud awards.[2] Blanton and Healey cross-appeal the court's grant of a directed verdict in favor of Mobil on the FIPA claim.
 
 
 3
 We affirm the antitrust judgment and reverse and remand both the contract/fraud judgment and the directed verdict on the FIPA claim.
 
 
 4
 * FACTS
 
 
 5
 The prime focus of this case is on the methods used by Western Washington Mobil agents to sell motor oil and "TBA & S"--tires, batteries, accessories and specialities--to Mobil dealers who lease their stations from Mobil. This thread knits together almost all charges in this lawsuit, since both Blanton and Healey alleged that their leases were terminated because they refused to purchase Mobil automotive products. The plaintiffs presented substantial evidence that certain Mobil agents used their double role as landlords and salesmen to gain an illegal competitive advantage for Mobil products.
 
 A. Antitrust Claims
 1. Tying Arrangements
 
 6
 The jury found that Mobil had imposed an illegal tying arrangement on both Blanton and Healey, a violation of Clayton Act Sec. 3 and a per se violation of Sherman Act Sec. 1. Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Mobil motor oil and TBA & S were tied to the lease and gasoline supply contract. Clayton Act Sec. 3 requires that both the tying and tied products be "goods, wares, merchandise, machinery, supplies, or other commodities...." Gasoline as a tying product and motor oil and TBA & S as tied products fall within this definition. See Broussard v. Socony Mobil Oil Co., 350 F.2d 346, 352 (5th Cir.1965). A lease of real property, while not covered by Clayton Act Sec. 3, can be a tying product under Sherman Act Sec. 1. See Northern Pacific.
 
 
 7
 Blanton and Healey each testified that they were threatened with termination of their dealerships unless they purchased Mobil motor oil and TBA & S. Blanton specifically testified that after he refused to make a large Mobil tire purchase, Mobil representatives made an inspection of his station and cited him for lease violations that included placement of trash in the trash enclosure, an unauthorized handle guard on the bathroom door that had been affixed to avoid vandalism, and damage to his personally owned desk. Mobil representatives confirmed the details of the inspection.
 
 
 8
 Other Western Washington Mobil dealers also testified that Mobil marketing representatives had threatened their leases in order to coerce purchases of Mobil products. George Peterson testified that the subject of his lease was raised when a Mobil representative attempted to sell him tires. Dick Page testified that Mobil's area manager asked him who was going to fill his gas tanks and maintain his station if he did not buy Mobil tires. Jimmy Scott was told that if he did not purchase Mobil products, Mobil might have to find a new station operator.
 
 
 9
 The pricing of Mobil products, particularly motor oil, supported the plaintiffs' assertion that Mobil dealers were used as captive consumers of Mobil products. There was unrebutted testimony that Mobil sold its motor oil to dealers at a price substantially above that at which Mobil oil was sold at retail by Safeway grocery stores and independent distributors. In fact, one Seattle area dealer, who owned his station and was thus not subject to any tying arrangement, testified that he found it economically preferable to drive across the Cascade Mountains to purchase Mobil motor oil from a distributor in Yakima than to purchase oil directly from Mobil in Seattle.
 
 
 10
 While Mobil representatives denied the existence of a tying arrangement, the district manager during the relevant period, Donald Hotsenpiller, did admit that purchases of oil and TBA & S were "considered" when Mobil decided whether to renew a station lease.
 
 2. Resale Price Maintenance
 
 11
 Although it may not be self-evident that resale price maintenance in an effort to reduce prices would be an inevitably pernicious practice, it is well settled that maximum resale price fixing is a per se violation of the Sherman Act Sec. 1. Albrecht v. Herald Co., 390 U.S. 145, 151-54, 88 S.Ct. 869, 872-874, 19 L.Ed.2d 998 (1968). The jury found that Blanton had been coerced into lowering the price of his gasoline 5 or 6 cents per gallon during the last three months of 1974. Blanton's net profits fell during this period. Mobil had argued that the lower retail price was merely suggested, but the jury decided otherwise.
 
 3. Group Boycott
 
 12
 The jury found that Blanton had been damaged by a group boycott as a result of coercion by Mobil. A group boycott, even one aimed against a single merchant, is a per se violation of the Sherman Act. Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212-13, 79 S.Ct. 705, 709-10, 3 L.Ed.2d 741 (1959); Ostrofe v. H.S. Crocker Co., 670 F.2d 1378, 1381 n. 3 (9th Cir.1982), vacated on other grounds, --- U.S. ----, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983).
 
 
 13
 The evidence on this charge dealt with Mobil's attempts to discourage Mobil dealers from purchasing motor oil and TBA & S from Blanton. Blanton had been designated a "Key Dealer" for Mobil brand tires. In this capacity, Blanton was consigned Mobil tires which were to be available to local dealers on a fill-in basis. However, Blanton was not satisfied with that capacity. He determined that he could sell a range of Mobil products to Mobil dealers at prices below that available to the dealers direct from Mobil. This would be accomplished by purchasing Mobil products from independent distributors. Plaintiff Healey and three other Mobil dealers testified that they had been instructed by Mobil not to purchase Mobil products from Blanton. Mobil's Hotsenpiller stated at trial, "I think also maybe Jerry Blanton wanted to grow bigger than Mobil's policies and procedures would maybe want him to grow." R.T. 1879. Faced with a declining market for his distribution of Mobil products, Blanton abandoned his resale operation. Subsequent to termination of his dealership by Mobil, Blanton returned to selling motor oil and TBA & S from various producers, with considerable success.
 
 4. Other Anticompetitive Acts
 
 14
 Plaintiffs also alleged that Mobil withheld performance of its obligations as landlord to coerce purchases of Mobil products and interfered with the advertising and promotional activities of Mobil dealers.
 
 
 15
 Several dealers testified that marketing representatives would raise the question of Mobil product purchases when service station maintenance was sought from Mobil. One former marketing representative, James Stueck, testified that he would tell dealers that increased purchases of Mobil TBA & S could expedite station maintenance. Blanton testified that he was told that if Delco could sell him batteries, Delco could paint his station.
 
 
 16
 Dealers testified that Mobil representatives insisted they curtail advertising and promotion of non-Mobil products. Mobil also placed restraints on the use of advertising for Mobil products.
 
 
 17
 The jury found in Mobil's favor on the claim of monopolization under section 2 of the Sherman Act. However, the jury did conclude that Mobil had made an attempt to monopolize in violation of section 2 and aggregated all antitrust damages for each plaintiff under the attempt claim.
 
 B. Contract/Fraud Claims
 
 18
 The leases that Blanton signed in 1973 and Healey signed in 1974 contained "evergreen clauses" providing for automatic renewals at current rental rates. However, the clauses had an exception, which stated that the lease "shall terminate at the end of any current period (original or renewal) by notice from either party to the other, given not less than 90 days prior to such termination." Blanton and Healey testified that they were told at the time of contract execution that the exception for unilateral termination would be exercised by Mobil only if Mobil had good cause to terminate. Moreover, their purchasing decisions as "independent businessmen" would not be considered in the renewal process. They further testified that they were told that their leases would be renewed for a total term of 8 years, assuming good performance by the dealers. Evidence of these oral modifications was admitted under Washington's parol evidence rule.
 
 
 19
 The jury found that Mobil had breached its contracts with Blanton and Healey by refusing to renew their leases. It further found that Mobil had engaged in promissory fraud or fraudulent misrepresentations in connection with the refusal to renew. Blanton and Healey had argued that they were terminated because of their eventual decisions to scale down their purchases of Mobil products, even though they had been assured that their Mobil purchases would not be a consideration in the renewal process.
 
 
 20
 C. Franchise Investment Protection Act (FIPA) Claim
 
 
 21
 The Washington FIPA, Wash.Rev.Code Sec. 19.100.010 et seq., is a comprehensive scheme of franchise regulation that places specific obligations upon a franchisor and rights in a franchisee. Laurence J. Gordon, Inc. v. Brandt, Inc., 554 F.Supp. 1144, 1159 (W.D.Wash.1983); see generally Chisum, State Regulation of Franchising: The Washington Experience, 48 Wash.L.Rev. 291 (1973). The district court granted Mobil a directed verdict on this count, ruling from the bench, as a matter of law, that the FIPA was not meant to apply to situations such as were presented in this case.
 
 II
 ANTITRUST ISSUES
 
 22
 Mobil makes three arguments for reversal of the antitrust judgment. It argues (1) the special verdict is irreconcilably inconsistent; (2) the jury's relevant submarket finding is clearly erroneous and requires reversal of the attempted monopoly judgment; and (3) Blanton and Healey failed to prove causal antitrust damages. We find none of these arguments persuasive.
 
 A. Jury Verdict
 
 23
 In filling out the special verdict form, the jury entered $0 damages for each of the separate charges of tying arrangements, price fixing, group boycott, and other anticompetitive business practices, although the jury specifically found for the plaintiffs on each of these counts. Antitrust damages were only entered under the jury's finding that Mobil had attempted monopoly in violation of section 2 of the Sherman Act. However, below the amount entered in damages for attempted monopoly, the special verdict asked, "which damages are included in the figure set forth [as damages for attempted monopolization]?" In answer to this question, the jury listed all the antitrust counts which it had found in favor of the plaintiffs but had not assigned damages.
 
 
 24
 As Mobil concedes, "[w]here there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962). Mobil argues that the jury findings cannot be resolved consistently because the damages awarded for attempted monopoly were, in Mobil's terms, "exactly the same" as the damages suffered by the plaintiffs from all the component antitrust violations for which $0 damages were specifically awarded. Mobil might have a point if the jury did not specifically indicate that damages for all the component antitrust violations were included in the amount awarded for attempted monopoly. The jury was specifically instructed that "[a] plaintiff cannot recover twice for the same injury, even though he may have two or more theories. Whatever injury a party suffered may only be compensated once." Instruction No. 39. In light of this instruction, the jury's decision to aggregate all damages under the overreaching attempt violation is not only reconcilable, but sensible.
 
 B. Relevant Market[3]
 
 25
 The jury found that Mobil had attempted to monopolize a relevant submarket consisting of sales of "Mobil-branded and non-Mobil-branded oil, lubricants, and TBA & S to Mobil dealers." Mobil apparently contends that this relevant market, as found by the jury, is clearly erroneous.[4] The question whether a particular relevant market does or does not exist is one of fact, and a jury's finding of a relevant market cannot be disturbed unless it is clearly erroneous. Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d 1291, 1299 (9th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982). Since Mobil has pointed to nothing in the record that would lead us to question the jury's factual finding, we are apparently asked to rule as a matter of law that a relevant submarket cannot consist of sales to dealers licensed by a common oil company.
 
 
 26
 We need not resolve the legal question presented by Mobil because it is clear that the jury's attempted monopolization finding may be sustained under Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964), and its progeny. In Lessig, we stated:
 
 
 27
 When the charge is attempt (or conspiracy) to monopolize, rather than monopolization, the relevant market is "not in issue." United States v. E.I. Du Pont & Co., 351 U.S. 377, 395 n. 23, 76 S.Ct. 994 [1007 n. 23], 100 L.Ed. 1264 (1956). Section 2 prohibits attempts to monopolize "any part" of commerce, and a dominant position in the business of distributing petroleum products and TBA was not necessarily prerequisite to ability to attempt to monopolize an appreciable segment of interstate sales in such products.
 
 
 28
 Id. at 474-75 (footnotes omitted).
 
 
 29
 Despite the sweeping language of Lessig, however, it is clear that we do require a showing of a relevant market in circumstances where the conduct of the attempted monopolizer is ambiguous or not clearly predatory. The current statement of the Lessig doctrine is found in Gough v. Rossmoor Corp., 585 F.2d 381 (9th Cir.1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979), where we stated that "in the absence of proof of relevant market and market power, the plaintiff must prove either predatory conduct or a per se violation of Sec. 1 to prove an attempt to monopolize." Id. at 390 (footnote omitted). Accord M.A.P. Oil Co. v. Texaco, Inc., 691 F.2d 1303, 1309 (9th Cir.1982); see William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1029 nn. 9 & 11 (9th Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).
 
 
 30
 Under the modified Lessig doctrine, Blanton and Healey have clearly sustained their burden of proof regardless of the correctness of the jury's relevant market finding. The jury specifically found that Mobil engaged in per se violations of Sec. 1 of the Sherman Act in its promotion of sales of motor oil and TBA & S. Although the Lessig doctrine has been subject to criticism, it is the law of this circuit, and we are bound to follow it. Knutson v. Daily Review, Inc., 548 F.2d 795, 814 (9th Cir.1976), cert. denied, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). We cannot reverse the jury's finding of attempted monopoly by reason of its definition of the relevant market because the jury's finding of per se violations of the Sherman Act makes the relevant market finding unnecessary to establish liability.
 
 
 31
 Mobil acknowledges that the present case falls within the reach of the Lessig doctrine. Indeed, the present case is almost identical on its facts to Lessig. Here, as in Lessig, the defendant is an oil company accused of using clearly anticompetitive and illegal methods to promote sales of automotive products to its branded service stations. Mobil argues that we should not rely on Lessig to uphold the jury verdict because the jury was allowed to find a relevant market, and in fact did identify a relevant submarket. This, Mobil argues, amounts to abandonment of Lessig as a ground for sustaining the jury verdict.
 
 
 32
 Mobil fails to realize that it is necessary to instruct the jury on relevant market in the event there is no finding of predatory conduct or per se violations of the Sherman Act. In the absence of predatory conduct or per se violations, an antitrust defendant may still be found liable for attempted monopoly, but only if the antitrust plaintiff can establish a relevant market as a framework for evaluating behavior that does not rise to the level of a substantial restraint of trade. M.A.P. Oil, 691 F.2d at 1309. In such a case, a relevant market is needed to evaluate the defendant's market behavior, and thus to determine whether the defendant had the attempt element of "specific intent to control prices or destroy competition." Id. In this case, Blanton and Healey needed to instruct the jury on relevant market in the event that the jury found for Mobil on their claims that Mobil committed per se violations of the antitrust laws. However, in the presence of per se violations, specific anticompetitive intent may be inferred. Inglis, 668 F.2d at 1027-28; California Computer Products, Inc. v. IBM Corp., 613 F.2d 727, 736-37 (9th Cir.1979).
 
 
 33
 Further proof that Blanton and Healey did not abandon Lessig as precedent for finding Mobil liable for attempted monopolization is shown by their proposed jury instruction No. 20. This instruction relied on the Lessig doctrine as a ground for establishing liability on the attempt count, stating that specific intent to monopolize may be inferred from per se acts in violation of the Sherman Act. Moreover, the trial court relied on the Lessig progeny case of Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc., 627 F.2d 919, 926 (9th Cir.1980),cert. denied, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981), to deny Mobil's post-trial motion for judgment n.o.v. There is no unfairness to Mobil in sustaining the jury verdict on the basis of Lessig, which, after all, has been the law of this court for almost twenty years.
 
 C. Causal Antitrust Injury
 
 34
 Mobil argues that the antitrust judgment must be reversed because Blanton and Healey failed to establish causal antitrust injury as a result of Mobil's anticompetitive acts. Causal antitrust injury is an essential element of an attempted monopoly claim. California Computer Products, Inc. v. IBM Corp., 613 F.2d 727, 736, 738 (9th Cir.1979).
 
 
 35
 To establish causal antitrust injury, "the plaintiff is required to establish with reasonable probability the existence of some causal connection between defendant's wrongful act and some loss of anticipated revenue." Flintkote Co. v. Lysfjord, 246 F.2d 368, 392 (9th Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). Accord Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc., 526 F.2d 1196, 1205-06 (9th Cir.1975), cert. denied, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). We review a trial court's determination that a plaintiff has suffered causal antitrust injury under the "clearly erroneous" standard. Reid Brothers Logging Co. v. Ketchikan Pulp Co., 699 F.2d 1292, 1299 (9th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 280, 78 L.Ed.2d 259 (1983); see Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 122-23, 89 S.Ct. 1562, 1575-76, 23 L.Ed.2d 129 (1969).
 
 
 36
 There is substantial evidence that Blanton and Healey were harmed by Mobil's antitrust violations. Undisputed evidence indicated that the Mobil motor oil that the plaintiffs were coerced into purchasing directly from Mobil was priced substantially higher than Mobil motor oil that was available from independent distributors, including Safeway. Proof in support of Blanton's group boycott claims included direct testimony by Mobil dealers that they would have purchased supplies from Blanton had they not been coerced by Mobil to cease purchases from Blanton. Both plaintiffs' evidence on the damages resulting from Mobil's interference with their advertising was sufficient to raise a jury question of whether the dealers lost anticipated income because of Mobil's actions. There is more than sufficient evidence to support the jury's finding of causal antitrust liability.
 
 
 37
 Mobil argues that the jury could have found that Blanton and Healey suffered losses from sources other than Mobil's illegal conduct. In this regard, Mobil introduced evidence that the dealers faced losses from road construction, lawful competition, and other external causes. The jury was properly instructed:
 
 
 38
 If you find that plaintiffs were injured by these causes, and that the alleged antitrust violations, if proven, were not a substantial factor in causing the injury, plaintiffs' injury would not have been proximately caused by the alleged conduct, and your verdict would have to be in favor of the defendants.
 
 
 39
 Instruction No. 39. This instruction is fully consistent with our holding in William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014 (9th Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), that a defendant's antitrust violations need only be "a material cause" of a business decline. Id. at 1051. There is substantial evidence to support the jury's conclusion that Mobil's anticompetitive actions were a material factor in Blanton and Healey's relative lack of business success.
 
 
 40
 Perhaps Mobil's arguments are directed at the amount of damages, rather than the fact of damages. So construed, Mobil's arguments are still unavailing. The required quantum of proof necessary to prove the amount of damages is less than that required to prove the fact of damages. In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation, 691 F.2d 1335, 1341 n. 7 (9th Cir.1982), petition for cert. filed, 51 U.S.L.W. 3873 (U.S. May 27, 1983) (No. 82-1938); Flintkote, 246 F.2d at 392. This lesser quantum of proof has been described as that sufficient to support a " 'just and reasonable estimate of the damage,' " Pacific Coast Agricultural, 526 F.2d at 1207 (quoting Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946)). Generally, we will not reverse the jury's assessment of the amount of damages unless the amount is "grossly excessive or monstrous," Siebrand v. Gossnell, 234 F.2d 81, 94 (9th Cir.1956); accord Barzelis v. Kulikowski, 418 F.2d 869, 870 (9th Cir.1969), or unless the evidence clearly does not support the damage award. City of Phoenix v. Com/Systems, Inc., 706 F.2d 1033, 1039 (9th Cir.1983). A damage award also cannot stand if it "could only have been based on speculation or guesswork." Murphy Tugboat Co. v. Crowley, 658 F.2d 1256, 1263 (9th Cir.1981), cert. denied, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982); see Bigelow v. RKO Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).
 
 
 41
 In this case, the plaintiffs presented substantial evidence of losses caused by concrete acts of Mobil, particularly the tying arrangements and group boycott of Blanton. The plaintiffs presented additional evidence comparing profitability from their subsequent service station operations as lessees of another oil company. Evidence was introduced showing that the subsequent unrestrained operations were similar to the restrained operations by reason of station location, station facilities, and gasoline gallonage pumped. This "before and after" evidence, comparing a plaintiff's restrained business with a comparable business operating free of antitrust restraints, is competent evidence of antitrust damages. See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 266, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 378-79, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927); Pacific Coast Agricultural, 526 F.2d at 1206-07. Blanton and Healey have presented evidence sufficient to justify the amount of antitrust damages awarded by the jury.
 
 III
 CONTRACT/FRAUD ISSUES
 
 42
 The jury awarded Blanton and Healey damages for Mobil's termination of their leases under two independent legal theories--breach of contract and fraud. Mobil attacks the award for breach of contract on two grounds. First, Mobil argues, the award is tainted because the trial court improperly allowed the introduction of parol evidence. Second, the damages awarded by the jury failed to account properly for amounts earned by Blanton and Healey in mitigation of their damages. Blanton and Healey respond that the possible infirmity in the contract award is irrelevant in light of the jury's finding that fraud constitutes an independent basis for the award. Mobil answers this defense by asserting that the evidence cannot support a finding of fraud or fraudulent misrepresentation on the part of Mobil.
 
 
 43
 We are convinced that Mobil is correct in asserting that the jury improperly failed to consider Blanton and Healey's mitigated damages. Although we agree with Blanton and Healey that there is sufficient evidence to support the jury's finding of fraudulent misrepresentation, the fraud finding cannot sustain the judgment either. As discussed below, under Washington law, there is no liability for fraud unless there is "consequent damage" from the fraud. Thus, should it turn out that the plaintiffs' damages from the fraud were totally mitigated, the fraud finding could not stand. Accordingly, we must reverse and remand the jury's damage findings on Blanton and Healey's termination claims for a consideration of mitigated damages. However, since any damages found on remand could be sustained on the fraud count, it is unnecessary to address Mobil's argument regarding the improper introduction of parol evidence.
 
 A. Contract Damages
 
 44
 After Blanton and Healey were terminated by Mobil, they operated, with considerable success, a service station leased from another oil company. In order to account properly for the plaintiffs' mitigation of damages, the jury was given a special verdict form designed to allow for simple computation of damages. For each plaintiff, the jury was asked first, "What income would the plaintiff have received for each of the 8 years of the breached renewal contract?" Second, the jury was asked, "How much income did the plaintiff actually receive during each of the eight years?"
 
 
 45
 The second question was answered as expected. However, the jury did not interpret the first question in the way anticipated. All parties agree as to how the jury did interpret the question. For the first question, the jury entered each plaintiff's mitigated damages, rather than income, for each year in question. However, in those years where mitigating income exceeded contract damages, the jury simply entered "0." This interpretation led the jury to enter damage figures for the first 3 years of the contract period and zeroes for the last 5 years. Blanton and Healey concede that after the third year of the breached contract, their actual income exceeded the projected income from the breached contract with Mobil. Thus, under the jury's interpretation of the first question, the last 5 years of the contract term should not have been characterized as years in which the plaintiffs' damages equaled their income in mitigation. Rather, during these last 5 years, under the jury's reading of the special interrogatory, negative totals should have been entered.
 
 
 46
 We agree with Mobil that the mitigating income over the full life of the contract must be used to offset damages from the breach. Having asked the jury to compute damages over an 8-year contract period, Blanton and Healey cannot ignore the mitigating income over that full period. Blanton and Healey argue that the contract can be divided into discrete periods of 1 year, and that mitigated damages for any one period is recoverable, even if there is no net injury over the life of the contract. We cannot accept this novel statement of law.
 
 
 47
 It is a hornbook rule that the purpose of compensatory damages is "to put the injured party in as good a position as he would have been put by full performance of the contract ...." 5 A. Corbin, Corbin on Contracts Sec. 1002, at 31 (1964) (emphasis added). See 11 S. Williston, A Treatise on the Law of Contracts Sec. 1338 (W. Jaeger 3d ed. 1968). Washington law is in full agreement. Prier v. Refrigeration Engineering Co., 74 Wash.2d 25, 30, 442 P.2d 621, 624 (1968). A natural corollary of this rule is that a contract plaintiff is not entitled to receive damages in excess of what he or she would have received if the defendant had fulfilled the breached contract. Platts v. Arney, 50 Wash.2d 42, 46, 309 P.2d 372, 375 (1957). Full mitigation must be offset against full damages over the life of the contract to put Blanton and Healey in the position they would have been in had Mobil performed its promise to renew their leases for 8 years.
 
 
 48
 It is thus necessary to remand the contract judgments for a calculation of fully mitigated damages. It seems likely that Blanton and Healey earned more by leaving Mobil than they would have earned as Mobil lessees. The record, though, does not "permit[ ] only one resolution of the factual issue," so a remand on damages is required. Pullman-Standard v. Swint, 456 U.S. 273, 292, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982).
 
 B. Fraud
 
 49
 The jury found as an alternate ground for awarding termination damages that Mobil had fraudulently misrepresented its intent to renew Blanton and Healey's leases regardless of whether they purchased Mobil products. We first consider whether there is evidence sufficient to support a finding of fraud, because in the absence of such evidence, we would be required to determine whether any termination damages at all can be awarded in light of Mobil's assertions regarding parol evidence of contract terms. Our affirmative answer to this first question requires an examination of whether our mitigation finding on contract damages applies to damages for fraud.
 
 1. Sufficiency of the Evidence
 
 50
 Mobil argues that the record does not support a finding of fraud because there is no evidence that Mobil had a specific intention not to perform its promise to renew Blanton and Healey's leases at the time the original leases were signed. Under Washington law, promissory fraud only exists when a promise is made with "a present intent not to attempt the future fulfillment of the promise[ ]." Fruit Industries Research Foundation v. National Cash Register Co., 406 F.2d 546, 550 (9th Cir.1969); see Markov v. ABC Transfer & Storage Co., 76 Wash.2d 388, 396, 457 P.2d 535, 539 (1969). Mobil argues that there is no evidence that it had any intention not to renew Blanton and Healey's leases when it entered into the original leases.
 
 
 51
 Mobil misconstrues Blanton and Healey's fraud case. Blanton and Healey argued that Mobil asserted that they could be "independent businessmen," buying and selling automotive products from and to whomever they chose, without jeopardizing their leases. They further argued that Mobil had no intention to fulfill this promise, but rather intended to terminate the leases unless the dealers adhered to the "Mobil plan" and made substantial purchases of Mobil motor oil and TBA & S. The evidence was sufficient to support the jury's verdict that Mobil did not intend to renew Blanton and Healey's leases if the dealers did not make substantial purchases of Mobil products.
 
 2. Fraud Damages
 
 52
 Although the discussion of mitigated damages in Part III-A, supra, was made in the specific context of contract law, the same analysis applies, mutatis mutandis, to fraud damages. It is an essential element of a claim of fraud under Washington law that the plaintiff suffer consequent damage from the fraud. A.B.C. Packard, Inc. v. General Motors Corp., 275 F.2d 63, 71 (9th Cir.1960); Markov v. ABC Transfer & Storage Co., 76 Wash.2d 388, 395, 457 P.2d 535, 539 (1969); Webster v. L. Romano Engineering Corp., 178 Wash. 118, 121, 34 P.2d 428, 430 (1934). Failure to prove this essential element is fatal to a fraud claim. Markov, 76 Wash.2d at 395, 457 P.2d at 539; Puget Sound National Bank v. McMahon, 53 Wash.2d 51, 54, 330 P.2d 559, 561 (1958). If Blanton and Healey gained a net benefit from Mobil's fraud by gaining the opportunity to enter into more advantageous business arrangements, their fraud claim would necessarily fail for lack of consequent damages. The jury's failure to consider Blanton and Healey's full mitigated damages thus requires a remand on the fraud count as well.
 
 IV
 FIPA DIRECTED VERDICT
 
 53
 Washington's FIPA has been called the most comprehensive franchise statute of its kind. Annot., 67 A.L.R.3d 1299, 1302-03 (1975). Its regulatory scheme comes into play only if two requirements are met: "(1) the agreement between the parties includes a license to the franchisee to use a trademark or 'related characteristic' of the franchisor, and (2) the franchisee pays a 'franchise fee.' " American Oil Co. v. Columbia Oil Co., 88 Wash.2d 835, 840, 567 P.2d 637, 640 (1977); see Wash.Rev.Code Sec. 19.100.010(4). The district court did not issue a memorandum discussing its reasons for directing a verdict for Mobil on the FIPA count. However, in its motion for a directed verdict, Mobil made essentially two arguments. First, it argued that service station agreements are not within the ambit of the statute. Second, it argued that even assuming service stations are covered by the FIPA, Blanton and Healey did not pay a "franchise fee" within the meaning of the statute.
 
 
 54
 In our review of the directed verdict below, we are "bound to view the evidence in the light most favorable to [the nonmoving party] and to give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962) (footnote omitted). Accord Greyhound Computer Corp. v. International Business Machines Corp., 559 F.2d 488, 492 (9th Cir.1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). To the extent the directed verdict depends on an interpretation of state law, we normally give deference to the interpretation of the district judge. Feldman v. Simkins Industries, Inc., 679 F.2d 1299, 1306 (9th Cir.1982). However, here the district court gave no basis for its interpretation. We are convinced that (1) any interpretation of the FIPA that would include a blanket exception for service stations would be clearly wrong; and (2) there is substantial evidence to support Blanton and Healey's assertion that a franchise fee was paid to Mobil.
 
 A. Service Station Exemption
 
 55
 The FIPA does allow for certain exemptions from its coverage. The only businesses fully exempted from the statute are motor vehicle dealer franchises. Wash.Rev.Code Sec. 19.100.010(4)(c). Additionally, certain credit and insurance transactions do not come under the provisions of the FIPA. Id. Sec. 19.100.010(4)(a)-(b). The FIPA grants no exemption, by its terms, to gasoline service stations.
 
 
 56
 Mobil argues that an exemption for service stations was created by the American Oil case. In that case, plaintiff Columbia claimed that it was in a franchise relationship with defendant American because it had purchased "tires, batteries, accessories and fuel oils" from American. Columbia further argued that a franchise fee was paid in the form of a rental of signs and credit card imprinters from American. 88 Wash.2d at 841, 567 P.2d at 641. The court ruled that these purchases did not establish a franchise with American. The court's explanation for this ruling was not that service stations were exempt from the FIPA. Rather, the court stated, "These purchases and rental charges are specifically excluded from the definition of a 'franchise fee.' Consequently, there was no payment of a 'franchise fee' by Columbia to American." Id. (citation omitted).
 
 
 57
 The court cited for this holding Wash.Rev.Code Sec. 19.100.010(11)(a), (e), which gives two exceptions to the general definition of a franchise fee. These exceptions are:
 
 
 58
 (a) the purchase or agreement to purchase goods at a bona fide wholesale price; ... (e) the purchase or lease or agreement to purchase or lease supplies or fixtures necessary to enter into the business or to continue the business under the franchise agreement at their fair market or rental value ....
 
 
 59
 Columbia never alleged that its purchases or rentals from American were at any price other than the bona fide wholesale price. Thus, Columbia plainly had not paid a franchise fee within the meaning of the statute, and could not gain the protection of the FIPA. There is no holding in American Oil that service stations are exempt from the FIPA regardless of the payment of a franchise fee.
 
 
 60
 Mobil argues that a footnote in American Oil compels a different conclusion. In that footnote, the court stated:
 
 
 61
 Of particular interest is the fact that S.B. 2313, presently pending before the legislature of the State of Washington, would amend the Franchise Investment Protection Act to apply to agreements granting service station dealers the right to sell gasoline under the supplier's trademark. This proposed legislation reinforces our view that the franchise act, as presently enacted, does not apply to jobber sales contracts between oil companies and private corporations.
 
 
 62
 88 Wash.2d at 841 n. 4, 567 P.2d at 641 n. 4. We have examined that proposed legislation, as well as an earlier bill to the same effect, S. 2145, 44th Reg.Sess. (Wash.1975), and neither bill supports the conclusion that the unamended statute has a service station exemption. Rather, each bill would include service stations within the FIPA's coverage regardless of whether a franchise fee was paid to the franchisor. The footnote is thus support for the proposition that service station operators making bona fide purchases from oil companies cannot claim protection under the FIPA unless they have paid a franchise fee.
 
 B. Franchise Fee
 
 63
 This brings us to the question of whether Blanton and Healey have presented substantial evidence that they paid Mobil a franchise fee. The FIPA first defines "franchise fee" generally, and then enumerates exceptions. The general definition is:
 
 
 64
 "Franchise fee" means any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for the mandatory purchase of goods or services or any payment for goods or services available only from the franchisor, or any training fees or training school fees or charges ....
 
 
 65
 Wash.Rev.Code Sec. 19.100.010(11) (emphasis added). Blanton and Healey argue that their mandatory purchases of tied motor oil and TBA & S come squarely within the statutory language. Furthermore, the tied purchases are not excepted from the general definition as purchases at a bona fide retail or wholesale price, id. Sec. 19.100.010(11)(a)-(b), (d)-(e), because the purchase price involved overcharges as part of the effects of the tying agreement.
 
 
 66
 We agree that Blanton and Healey have presented substantial evidence that they have paid a franchise fee. The concept of mandatory purchase is implicit in the concept of an illegal tying arrangement under the antitrust laws. It is irrelevant that a forced overcharge is not specifically denominated a franchise fee. Professor Chisum, in his exhaustive analysis of the FIPA, states that the FIPA is intended to reach "franchisors who might attempt to extract a hidden fee in the form of overcharges for property sold to the franchisee." Chisum, State Regulation of Franchising: The Washington Experience, 48 Wash.L.Rev. 291, 343 (1973). Washington decisional law is in accord with Professor Chisum, one court holding that the term "franchise fee" includes "fees hidden in the franchisor's charges for goods or services." Lobdell v. Sugar 'N Spice, Inc., 33 Wash.App. 881, 892, 658 P.2d 1267, 1273 (1983). Since Blanton and Healey presented substantial evidence that they paid a franchise fee, the directed verdict in favor of Mobil on the FIPA claim must be reversed.
 
 V
 CONCLUSION
 
 67
 The antitrust judgments in favor of Blanton and Healey are AFFIRMED.
 
 
 68
 The contract/fraud judgments in favor of Blanton and Healey are REVERSED and REMANDED for further consideration of mitigated damages.
 
 
 69
 The FIPA directed verdict in favor of Mobil is REVERSED and REMANDED for further proceedings consistent with that Act.
 
 
 70
 Blanton and Healey are entitled to reasonable attorney's fees for the antitrust portion of this appeal. Upon presentation of appropriate documentation, this court will determine such fees.
 
 
 71
 Parties shall bear their own costs on this appeal.
 
 
 
 [1]
 Washington's Consumer Protection Act contains trade regulation that parallels the federal antitrust statutes. It expressly directs that its purpose is to "complement the body of federal law." Wash.Rev.Code Sec. 19.86.920. See State v. Ralph Williams' North West Chrysler Plymouth, Inc., 82 Wash.2d 265, 271, 510 P.2d 233, 238 (1973)
 
 
 [2]
 Included in the single damages awards were small sums for minor claims sounding in contract that arose during the period prior to lease termination. On appeal, Mobil has not contested these smaller awards
 
 
 [3]
 This discussion pertains only to the finding of attempted monopoly
 
 
 [4]
 Mobil actually argues that the jury found an erroneous submarket consisting of "Mobil-branded and Mobil-brokered" automotive products. If this submarket really had been found, Mobil's cause may have been aided by the common rule that a manufacturer has a natural monopoly over his own products, and does not violate the antitrust laws unless he uses the natural monopoly to gain control of the market in which his product competes. See Bushie v. Stenocord Corp., 460 F.2d 116, 120 (9th Cir.1972). While it is true that Blanton and Healey desired a jury instruction on a submarket consisting of Mobil branded and brokered products, the trial court ultimately declined to give that instruction. The relevant submarket referred to in the jury instructions and the jury's special interrogatories appears as stated in text above. Blanton and Healey's answering brief noted this error in Mobil's argument, yet Mobil renewed the same relevant market description in its reply brief. We admit to some puzzlement over Mobil's persistent mischaracterization of the jury verdict